## SORGE *v.* DICKIE.

1. VENDOR AND PURCHASER—LAND CONTRACTS—CANCELLATION OF INSTRUMENTS—ELECTION OF REMEDIES.

Where there is no agreement for cancellation of a contract for the sale of realty, if the abstract fails to show a merchantable title and shows the pendency of a suit for specific performance of another land contract against the vendor, the purchaser has an election to receive back the deposit and release the vendor, or take the inferior title.

2. CONTRACTS—LAND CONTRACTS—PERFORMANCE—TIME—WAIVER.

The time of performance of a land contract can be waived by the parties, and such waiver can be shown by their acts.

3. SAME—SPECIFIC PERFORMANCE—TIME—WAIVER—EVIDENCE.

On a bill for specific performance of contract for the sale of realty, evidence *held*, to show waiver of the time of performance.

4. SAME—LAND CONTRACTS—FRAUD—MISREPRESENTATION—EQUITY.

Where the simplicity and credulity of parties are taken advantage of by the shrewdness, overreaching, and mis-

representation of the other party, and they are thereby induced to do, unwittingly, something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, a court of equity may interpose.

5. SAME.

On a bill for specific performance of a contract for the sale of realty, evidence *held*, insufficient to show that the vendor was taken advantage of as the result of the shrewdness or misrepresentations of the purchaser so as to sell the land at less than its value.

Cross-appeals from Wayne; Smith (Clement), J., presiding. Submitted October 18, 1917. (Docket No. 30.) Decided December 27, 1917.

Bill by Paul A. Sorge against Louise Dickie for the specific performance of a land contract. From the decree rendered, both parties appeal. Affirmed.

*U. Grant Race* and *Walter F. Haass* (*Harry Allen*, of counsel), for plaintiff.

*William Van Dyke* (*Otto Kirchner*, of counsel), for defendant.

STONE, J. The object sought by the bill of complaint herein was the specific performance of a land contract, entered into by the defendant as vendor and the plaintiff as purchaser on June 10, 1915. The defendant had been the owner of 20 acres of land in the township of Greenfield, Wayne county, since about 1890. She, with her husband, Dr. James F. Dickie, had formerly lived in Detroit, but for 22 years they had lived in Berlin, Germany, where Dr. Dickie had conducted the American Presbyterian church. They came to Detroit in May, 1915, to sell defendant's 20 acres of land. This land was situated about one-quarter of a mile north of the city limits of Detroit, as they existed in 1915. It had a frontage of 20 rods

on the west side of Eighteenth street, or Linwood avenue, and an east and west depth of 160 rods. Before leaving Berlin, and about the last of April, defendant had received a cablegram from John W. Lathrop asking the price of the land. Dr. Dickie sent a cablegram in reply, signed "Dickie," stating the price to be $25,000. It was claimed by Dr. Dickie that defendant told him he might cable $35,000, but by mistake he cabled $25,000.

The defendant and her husband arrived in Detroit about May 31, 1915. According to their testimony, they made inquiries of different parties as to the value of the land; among others, they asked Richard P. Joy, president of the National Bank of Commerce of Detroit, and of the Joy Realty Company, and Mr. Joy said the property ought to sell for $2,000 to $2,500 per acre, but he would not give the higher figure. The defendant testified:

"Mr. Jordan offered me $40,000 after I had come here. I received other offers, I can't remember from whom, but one was for $32,500. Right away after arriving in Detroit about the 31st of May, in order to find out what this land was worth, I asked a few friends who were not real estate men, but were owners of property in the vicinity. * * * I had last been here the year before, in 1914. I had visited acquaintances. I had visited Mr. Stonehouse. I don't remember what Mr. Stonehouse told me the property was worth. When I was here before, in 1914, I learned that land values in Greenfield were going up. I do not remember what I determined my property was worth in 1914. I could not remember whom I talked with in 1914, when I visited here, other than Mr. Stonehouse, but I remember when I was here in 1914 Mr. Stonehouse told me that he had sold a portion of his land to Mr. Oakman. I do not remember what Mr. Stonehouse told me he got for it."

In 1915, among other persons that Dr. and Mrs. Dickie talked with before the contract was made was

Julius H. Haass, president of the Wayne County & Home Savings Bank. Dr. Dickie testified:

"I do not remember that we got Mr. Haass' idea of the value of this property. He told me in a general way, if he said anything at all. Julius H. Haass and I talked about real estate in Detroit. He said it was booming. Mrs. Dickie was with me, I think. That was about all that was said, that real estate was booming, but he did not know the value of land right out there."

This was about June 2d. It appears that Julius H. Haass called in his brother, Walter F. Haass, and introduced him to Dr. and Mrs. Dickie. Dr. Dickie's testimony is very vague as to where he first met Walter F. Haass, but we gather from the other testimony that Julius H. Haass then and there, in the presence of Dr. and Mrs. Dickie, told Walter F. Haass of the land in question; that they had an offer of $25,000 for it, and asked his opinion as to its value; that Walter F. Haass then told Dr. and Mrs. Dickie that there was a great boom in real estate in Detroit; that nobody could be sure of how long this would last; that it might go up and it might go down, and he told them of plaintiff; and that he valued plaintiff's opinion with reference to real estate values very highly. Walter F. Haass later discussed the matter with plaintiff, and they went out and saw the land, and talked about how it might be handled by a syndicate that they might form. A few days later Walter F. Haass introduced either the Dr. and Mrs. Dickie, or Dr. Dickie alone, to the plaintiff, and the latter stated that $25,000 was a fair price for the land. There is no claim that the plaintiff was ever employed by either Dr. or Mrs. Dickie, or that he was the agent of either of them. The defendant testified:

"I always regarded Mr. Sorge as a prospective purchaser of my land, until I was sued by him."

Mr. Stellwagen was the attorney for the defendant. On June 10, 1915, the defendant and her husband met with plaintiff in Mr. Stellwagen's office, and after some discussion in which defendant asked $35,000 for the land, she finally agreed to take $30,000, and the agreement was drawn by Mr. Stellwagen and signed by the parties. The agreement was as follows:

"Know all men by these presents, that I, Louise Dickie, of Detroit, Michigan, of the first part, hereby offer to sell to Paul A. Sorge, of the same place, of the second part, that certain piece or parcel of land situated in the township of Greenfield, county of Wayne, and State of Michigan, described as follows, to wit: The north half of the north half of the south half of quarter section twenty-eight (28), of the ten-thousand-acre tract, containing twenty (20) acres more or less, for the sum of thirty thousand dollars ($30,000.00), to be paid as follows: five hundred dollars ($500.00) on the execution of this offer, the receipt whereof is hereby confessed and acknowledged; a Burton or Union Trust abstract of title is to be furnished, and within three (3) days after such abstract is furnished, said first party is to give second party or his assigns a warranty deed of said property, and said second party is to pay said first party at that time the further sum of nine thousand five hundred dollars ($9,500.00) in cash, the balance of the purchase price to be secured by a mortgage upon said property, payable three (3) years after June 15, A. D. 1915, with interest at the rate of six (6) per cent. per annum payable semi-annually, said mortgage to be dated June 15, A. D. 1915, and to be in the usual form of committee mortgages used in Detroit, Michigan, and a note for twenty thousand dollars ($20,-000.00) to be given to which said mortgage shall be collateral.

"It is contemplated by the parties hereto that said land shall be platted into one hundred twenty-eight (128) lots more or less, having a frontage of about forty (40) feet each. It is agreed that there shall be released from said mortgage four (4) or more lots on payment of two hundred fifty dollars ($250.00)

for interior lots, and at the rate of three hundred dollars ($300.00) for corner lots, not less than four (4) lots to be released at any one time. If said abstract when furnished does not show merchantable title, said five hundred dollars ($500.00) shall be returned to said second party. If said abstract does show merchantable title, and said second party refuses to complete the purchase, said $500.00 shall belong to first party. In case the purchase is completed, said five hundred dollars shall be deemed as part of the purchase price. The warranty deed is to be furnished and the deal closed within three (3) days after the abstract is certified to date, and at any rate on or before the 25th day of June, A. D. 1915.

"Said first party agrees that she will appoint a trust company or some other person in Detroit as her attorney-in-fact with full power to join in the plat of said property and to execute releases from said mortgage as same may be called for. And said second party hereby agrees to purchase said land on the terms above specified.

"Dated, Detroit, Michigan, June 10, A. D. 1915.
                                "LOUISE DICKIE. [L. S.]
                                "PAUL A. SORGE. [L. S.]"

The plaintiff's check for $500 was delivered to the defendant on June 10, 1915. It never has been cashed, and was tendered to the plaintiff at the hearing. The abstract was given to the plaintiff by the defendant on June 11, 1915, at which time it was certified only to January 20, 1913. The plaintiff had it sent to the abstract company to be certified to date, and received it back from the company on June 28, 1915.

It appeared from the abstract that about June 17, 1915, a bill of complaint was filed by John W. Lathrop against Mrs. Dickie praying for specific performance of an alleged agreement to sell said land to him, and the defendant was enjoined from conveying the land. Before the signing of the agreement of June 10th neither the defendant nor Dr. Dickie told plaintiff or Walter F. Haass of the Lathrop transaction, but im-

mediately after the service of the injunction on Mrs.
Dickie she, or Mr. Stellwagen for her, told plaintiff
or Mr. Haass about the suit.   There was testimony
to the effect that Walter F. Haass told Dr. Dickie
that he was the attorney of the plaintiff before the
contract was signed.   It is undisputed that both Dr.
and Mrs. Dickie talked with W. F. Haass, relative to
the equities and facts involved in the Lathrop suit,
and from their statement it appeared to Mr. Haass,
and he so stated to them, that they should win that
suit.   The parties disagree materially as to what oc-
curred at this time.   Walter F. Haass testified, at the
hearing, as follows:

"Without considering the other matter, they told me
that Mr. Stellwagen thought they could get the matter
on immediately, and that the matter could be settled
at once, and I concurred in that.   Undoubtedly they
would win their suit, and I agreed with them, and it
was determined between—we all determined we would
wait until that matter came on, with the sale to us;
that the sale to us would remain, and they were afraid,
probably, we might sue them for damages, or we
might attempt to get damages from them.   I assured
them there would be nothing of that kind."

After testifying to a conversation with Mr. Stone-
house, in which he had stated that the price was in-
adequate, Dr. Dickie testified:

"The next day we went to see, Mrs. Dickie and I
went up to Mr. Haass and told Mr. Haass that Mrs.
Dickie wanted $35,000.   Everybody around there was
holding out for $2,500 [an acre], and said they were
going to get it.   Mrs. Dickie said they are going to
get it all around there.   That was on the 12th day of
June, two days after the signing.   I saw Mr. Walter
Haass shortly after that and asked him if he saw Mr.
Stellwagen he might do some good as to expedition.
If he had any influence, otherwise to use it, because
we wanted the Lathrop case out of the way.   I never
employed Mr. Haass in any capacity.   I asked Mr.

Haass to do something to get the Lathrop matter out of the way because we had been talking about the matter.

"Q. That was a matter of fact because Haass' client had contracted with Mrs. Dickie whereby he had a right to purchase the land?

"A. Mr. Haass belonged to a syndicate. Mr. Sorge told us, whenever there was anything we wanted to say, to give it to Mr. Haass. Mr. Haass saw Mr. Sorge frequently.

"Q. You always knew that?

"A. Yes. He was a member of the syndicate.

"Q. In pursuance of that, you assured Mr. Haass that you and Mrs. Dickie were doing and would do all that you could do to get the Lathrop matter out of the way?

"A. Yes. We wanted to defeat Lathrop, and we wanted the Lathrop matter out of the way.

"Q. You wanted it out of the way to complete the deal with Sorge?

"A. No, we were not satisfied with it. Mrs. Dickie went up the day when she was served with the summons from Lathrop to tell them we were not. She said she released them. She had a contract and check. Mr. Haass said: 'Mrs. Dickie, I do not want to give you any trouble. We will get along and we will just let the matter rest.' He would not take it.

"Q. What he said was that if the Lathrop matter was determined against you, he would not hold Mrs. Dickie to her bargain?

"A. Yes.

"Q. That is what he said and what he meant?

"A. Yes.

"Q. As a matter of fact, you did not release Mr. Sorge, did you?

"A. Yes. We told him they were released.

"Q. You did not give back the check?

"A. Yes, we offered to give it back, but they would not take it. We left it with Mr. Stellwagen, and gave him orders to send the check because we were going to Europe."

The Lathrop suit was never tried. Dr. and Mrs. Dickie made a trip to Germany in October, 1915, to

get the original cablegram relating to the Lathrop matter. The defendant had asked Mr. Haass to speak to Mr. Stellwagen to have him hurry up the Lathrop suit. That suit was finally settled about August 5, 1916, through the efforts of Mr. Haass, who, for the plaintiff, paid $500 of his money, and received a stipulation for a discontinuance of the suit, and a quitclaim deed running to the defendant. This was done without express authority from the defendant, but with the knowledge of Mr. Stellwagen, her attorney, and the papers were left with him. Upon that subject Mr. Haass testified:

"I have testified that I paid Prentis & Mulford for Mr. Lathrop $500 for discontinuance of the Lathrop suit and a quitclaim deed running to Mrs. Dickie, covering the land in question. I did not have any express authority from Mrs. Dickie to pay this money.

"Q. By what authority did you settle this matter, or close this deal?

"A. Mrs. Dickie and Dr. Dickie had often asked me to do everything in my power to get that matter out of the way and get it closed, but they never authorized me to pay out any money, and I am making no claim that I am entitled to reimbursement for that. Before paying this money I made some attempt to get express authority from Dr. Dickie."

It was the claim of the defendant that after the service of the injunction she not only offered to return the check, but to rescind the contract, on the ground that she could not deliver title. This was specifically denied by both the plaintiff and Mr. Haass. Both the plaintiff and Mr. Haass testified that defendant did not ask for more money until after her return from Germany in June, 1916. It was also claimed by defendant and testified to by her, and also by Dr. Dickie, that, about October 3, 1915, just before they left for Germany, they called on the plaintiff, and Dr. Dickie testified that the latter said, "What is to become of

my contract if the bottom goes out of the land?" And that defendant said, "We will release you; we will take back our land, but if the property goes up, the price must go up also"; and that Dr. Dickie said to plaintiff, "What is sauce for the goose is sauce for the gander," and that plaintiff smiled. Defendant testified:

"I told Mr. Sorge we were going, and it was getting difficult and dangerous crossing the sea, and I said I would not get back during the winter. He says, 'What will I do if you are not here?' I says, 'I will take it back, and I am satisfied the land will increase, and you will make it good.' He says, 'Yes.'"

This was denied by plaintiff, who testified that there was never any such conversation, and that he had never made any agreement to rescind or modify the contract of June 10, 1915. Finally, on August 11, 1916, the plaintiff called at the residence of Dr. and Mrs. Dickie to make tender of the $9,500 and demand a deed. The defendant was ill and could not be seen. This was on Friday evening. Upon this subject Dr. Dickie testified:

"I said I would be down tomorrow morning with Mrs. Dickie, if she was well enough. At the same time I says, 'Mr. Sorge, we think you ought to make Mrs. Dickie a substantial addition in view of what she has done for you, or gone through for you.' I told him at the same time the contract did not exist, as he will tell you. The contract in our opinion was not in existence. That was the same evening he called there, on the 11th of August, when they wanted her to sign it. I told him the contract had no more validity, they having broken it, before the 25th of June, 1915. Consequently the sum of money they offered was insufficient because it did not include any assessments (?) Mr. Haass had promised, or the interest."

After the plaintiff left, Dr. Dickie wrote and mailed to him the following letter:

*"My Dear Mr. Sorge:* I regret to say that Mrs. Dickie finds it absolutely impossible to do any business on tomorrow. She is so unwell that we must delay the matter. Friday night. Yours truly,

"J. F. DICKIE."

The bill of complaint herein was filed on August 14, 1916. The defense in the court below, and here was that:

(1) The contract was not mutual, in that after June 25, 1915, the plaintiff was not, by its terms, bound to buy the land. That the abstract of title when furnished did not show a merchantable title, and for that reason the deal could not be closed.

(2) The parties did not deal at arm's length.

(3) The consideration was inadequate.

The learned circuit judge, who heard the evidence and saw the witnesses, found for the plaintiff, and entered a decree for specific performance of the contract. In a written opinion he said:

"I am of the opinion that the plaintiff has made out his case and is entitled to a decree as prayed for in his bill. I do not think the first position taken by the defendant is of any force. It was no fault of the plaintiff that this land was incumbered. It was no fault of the plaintiff that the defendant could not give a deed on or before the 25th day of June, 1915. It is not claimed that it is the defendant's fault, but it is plain to be seen that by some action of the defendant, which was probably set forth in the bill filed by John W. Lathrop, that she placed herself in the situation in which she could not convey at that time to the plaintiff, Mr. Sorge, but the plaintiff, however, should not be held to be in fault because of that incident, and I am of the opinion that that is not a defense, and that the defendant is not absolved from the making of a deed under the contract if the plaintiff desires to have it done.

"The second position of the defendant in the case probably states the truth that the land was of a speculative value at the time the contract was made.

"As to the third claim of the defendant, that de-

fendant had no knowledge of the value of the land, and that the land was of a greater value than plaintiff gave for it, and that the plaintiff knew that it was and misled the defendant to sell at a price far below its value, I am of the opinion that the proofs do not sustain such a position. The truth is that the defendant and her husband, Dr. Dickie, who acted with and for her, are intelligent, cultured people, and they are not people easily imposed upon. The land was open to their view and they were permitted, if they desired to do so, to get all the information they could as to its value, and the proofs show that they got considerable information in relation to it before and after the contract was made; and I think the position taken by the defendant that she was misled by the plaintiff, or that the plaintiff and his advisers did anything which would mislead her, is not supported by the proofs. Therefore it is my judgment that that defense is not made out.

"I think it may be well for me to state another thing in connection with this matter, and that is this: That from the proofs in the case as they appear to me, I am satisfied that at the date of this contract, June 10, 1915, the plaintiff was giving about all that land was worth at that time, and I am of the opinion that had the Lathrop suit not been commenced so that she could have carried out her contract and had the matter closed before the 25th day of June, that it would have been done, and that that would have been the end of it. In other words, I am satisfied that the defendant was in no way misled as to the value of the land at the time the contract was made, and that had it not been for the unfortunate circumstance of the Lathrop suit and the advance in value after that, the deal would have been consummated, and that the contract was entirely free from deception or fraud of any sort on the part of the plaintiff towards the defendant."

Both parties have appealed to this court.

1. The contract when made was in its terms certain and mutual. There was no agreement to cancel the contract if the abstract failed to show a merchantable title. When the abstract showed the pendency of the

Lathrop suit, the plaintiff might have elected to receive back the deposit and release the defendant, or take the inferior title. *Eppstein* v. *Kuhn,* 225 Ill. 115 (80 N. E. 80, 10 L. R. A. [N. S.] 121) ; *Covell* v. *Cole,* 16 Mich. 223; *Anderson* v. *Kennedy,* 51 Mich. 467 (16 N. W. 816) ; *Smith* v. *Mathis,* 174 Mich. 262 (140 N. W. 548) ; *Lansing Co.* v. *Rogers,* 183 Mich. 334, 338 (149 N. W. 1000).

It is the claim of the plaintiff that the parties elected to hold the contract, and that he proceeded to plan the development of the property, to maintain the *status quo,* pending the time when the Lathrop suit should be settled or determined, thus waiving the terms of the contract as to the time of performance. We think that it is well settled that the time of performance of a land contract can be waived by the parties, and that such waiver may be shown by their acts. *Robinson* v. *Trufant,* 97 Mich. 410 (56 N. W. 769) ; *Cughan* v. *Larson,* 13 N. D. 373 (100 N. W. 1088-1091).

We think that the claim of the plaintiff in this regard is sustained by the weight of the evidence, and by the conduct of the parties. It is almost inconceivable that the plaintiff and his attorney would have interested themselves and spent their money in getting the Lathrop suit out of the way, and would have proceeded with the syndicate project, except upon the theory that the contract of the parties was in force. We cannot agree with defendant's counsel in the claim that plaintiff never made an attempt at performance of the contract until in August, 1916. It does appear that the price of land was fluctuating in June, 1915. The defendant knew that fact, as may be gathered from her testimony, and that of Dr. Dickie.

2. Did the parties deal at arm's length? The contract upon its face was a fair one. There were no confidential relations. Where the simplicity and credulity of parties are taken advantage of by the shrewd-

ness, overreaching and misrepresentation of the other party, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, a court of equity may with propriety interpose.

We have examined the testimony with care, and we are unable to find any evidence that the plaintiff or Mr. Haass, in any way or manner, violated the rule above stated. They seem to have been open and frank in their statements and dealings with the defendant, and with her husband. Defendant testified that she had been offered a larger price, but did not explain why she did not accept. She testified, in answer to questions by her own counsel, that she did not believe what plaintiff told her of the value of the land, but that she accepted his price because he said he would not give more. She seems to have made the bargain with her eyes open, and in the presence of her own counsel. We are unable to find from this record that the contract was ever changed.

3. In the light of all the testimony, we cannot say that the contract price was inadequate. We adopt the language of the circuit judge upon that subject. There is abundant evidence that the value of the land has greatly increased since June, 1915. It was no secret that plaintiff, with Mr. Haass and others, intended to plat and sell the land. That they would sell at a large advance was to be expected. See *Ogooshevitz* v. *Arnold*, 197 Mich. 203, 212 (163 N. W. 946, 949). Without further discussing the equities of the situation, it is sufficient to say that in our opinion there are no equitable reasons why the contract as made on June 10, 1915, should not be specifically performed.

The decree of the circuit court is, in all things, affirmed. The plaintiff appealed upon the question of interest. The decree being affirmed, under the circumstances, neither party will recover as against the other any costs in this court.

OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred. KUHN, C. J., did not sit.