METTETAL *v.* HALL.

1. CANCELLATION OF INSTRUMENTS—RESTORATION—TENDER.

   Restoration or tender before suit is wholly superfluous as a prerequisite to a suit in equity for rescission or cancellation.

2. SAME—SALE OF PROPERTY BEFORE COMMENCEMENT OF SUIT—TENDER.

   Generally where property has been sold under a prior existing mortgage lien before commencement of suit in equity for rescission, restoration or tender is superfluous as a prerequisite to the commencement of suit.

3. INSANE PERSONS—APPEARANCE BEFORE CHANCELLOR OR JURY.

   At common law in case the mental competency of a person became involved it was proper to have him appear for inspection either before the chancellor, if in a suit in equity, or before the jury, if case was before it, to the end that knowledge on an issue of insanity may be acquired.

4. TRIAL—INSANE PERSONS—EXCHANGE OF PROPERTY—VISIT BY COURT.

   In suit by guardian of an incompetent person to set aside an exchange of conveyances of realty consummated prior to guardian's appointment, it was competent for trial court to visit the incompetent person.

5. WITNESSES—INSANE PERSONS—EXCHANGE OF PROPERTY.

   The fact that a person has been found mentally incompetent and a guardian appointed over her by reason of her mental incapacity would not prevent her being sworn as a witness in suit to set aside exchange of conveyances of realty which had been executed prior to appointment of guardian.

6. SAME—INSANE PERSONS—OATHS—WAIVER.

   In suit to set aside an exchange of conveyances of realty which were executed by plaintiff's ward before he was appointed her guardian, where court and counsel visited ward, an incompetent person, and took her statement without her having been sworn,

defendants who had a right to insist that she be sworn and did not do so waived such requirement and could not thereafter object.

7. TRIAL—WAIVER.

Provisions of law that are waived in the conduct of a trial cannot afterwards be set up by way of objection to any step taken upon the footing of such waiver.

8. ESTOPPEL—EFFECT OF WAIVER.

One in possession of a legal right who waives it is precluded from claiming anything by reason of it afterwards, as waiver is equivalent, in effect, to an admission that it has been performed and is, in a sense, evidence of performance.

9. STIPULATION—WAIVER OF OBJECTION TO CLASS OF EVIDENCE.

One may waive his right to object to a particular class of evidence by stipulation.

10. EVIDENCE—INCOMPETENT EVIDENCE ADMITTED WITHOUT OBJECTION—WEIGHT.

Incompetent evidence, admitted without objection, must be allowed to have such weight and force as the triers of the facts see fit to accord to it.

11. TRIAL—WAIVER OF OBJECTION TO COMPETENCY OF TESTIMONY.

A waiver of objection to competency made at one stage of the taking of testimony is a waiver during the progress of the proceedings.

12. WITNESSES—OATH—WAIVER OF OBJECTION.

Where a witness gives his testimony without being sworn, the adverse party by not objecting thereto waives any objection to it.

13. ESTOPPEL—WAIVER OF OBJECTIONS.

A party to a transaction who induces another to act upon the reasonable belief that he has waived, or will waive, certain objections which he is entitled to assert, will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled.

14. SAME—ACQUIESCENCE IN TAKING UNSWORN STATEMENT OF INCOMPETENT PERSON.

To permit defendants who permitted the taking of the statement of an incompetent person without insisting that she be sworn to repudiate their acquiescence would not only be prejudicial

to plaintiff, her guardian, but a fraud on the court before whom such statement was made.

15. EVIDENCE—MENTAL CAPACITY—FRAUD—UNDUE INFLUENCE—DECLARATIONS OF GRANTOR.

Statements of a grantor both before and after the execution of a deed are relevant and material when mental capacity, fraud, or undue influence are involved.

16. INSANE PERSONS—CONVEYANCES OF REALTY VOIDABLE.

Transactions involving the conveyance of real estate by a mentally incompetent person are voidable.

17. CANCELLATION OF INSTRUMENTS—EQUITY—INSANE PERSONS.

A court of equity is the proper tribunal in which to set aside conveyances of realty executed by mentally incompetent persons.

18. EQUITY—WEAK-MINDEDNESS—PRESUMPTIONS AS TO VALIDITY OF TRANSACTION—BURDEN OF SHOWING FAIRNESS.

While mere weak-mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract or set aside an executed agreement or conveyance, in case there is a real mental weakness a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming benefits under the instrument to show its perfect fairness and the capacity of the other party.

19. SAME—WEAK-MINDEDNESS—GROSSLY INADEQUATE CONSIDERATION—SETTING ASIDE CONVEYANCES.

Great weakness of mind of grantor coupled with grossly inadequate consideration for conveyance constitute ground for setting aside the conveyance in a court of equity where proper and seasonable application for such relief is made by the injured party or his representatives or heirs.

20. SAME—UNPROTECTED PERSONS.

A court of equity will protect a person who is not equal to protecting himself in the particular case.

21. FRAUD—REPRESENTATION AS TO VALUE—RELIANCE.

Where a false representation as to value is intentionally made to a person ignorant of value with the intention that it shall be relied upon, it is fraudulent.

22. DEEDS — MENTAL CAPACITY — CONSIDERATION — FRAUD — CAN-
    CELLATION OF INSTRUMENTS.

> Transaction whereby physically and mentally infirm, aged, ig-
> norant, and credulous lady, without legal advice and in reliance
> upon realty broker conveyed $5,300 worth of desirable, free
> and clear real estate for a worthless paper equity in undesirable
> property assessed for $1,514 and mortgaged for $2,300, which
> mortgage was in default and foreclosure imminent, in order to
> relieve her necessitous circumstances, false representations
> were made as to benefits she would receive, and money paid
> down was divided in real estate commissions, *held,* properly set
> aside.

Appeal from Wayne; Taylor (Mark D.), J., pre-
siding. Submitted January 3, 1939. (Docket No. 10,
Calendar No. 40,285.) Decided March 9, 1939.

Bill by Jerome Mettetal, as guardian of the estate
of Eliza Dunning, a mentally incompetent person,
against David Hall and wife to set aside conveyances
of real estate and other relief. Decree for plaintiff.
Defendants appeal. Affirmed.

*James Gibbons* and *Jerome Mettetal,* for the plain-
tiff.

*Welsh, Bebout & Hill,* for defendants.

POTTER, J. The bill of complaint herein was filed
by plaintiff as general guardian of Eliza Dunning, an
alleged mentally incompetent person, to set aside a
conveyance of real estate from her to defendants and
a conveyance of real estate from defendants to Eliza
Dunning; for an injunction, accounting, and general
relief, on the ground Eliza Dunning was mentally in-
competent to enter into the transaction and fraud
claimed to have been practiced by defendants upon
her. Defendants deny all material allegations of
plaintiff's bill of complaint, allege the property

traded to her was worth much more than that which they acquired, and set up certain matters which they claim estop plaintiff from maintaining this suit, and ask that the bill of complaint be dismissed. After hearing the testimony, the trial court filed a written opinion and entered a decree for plaintiff. Defendants appeal, claiming the decree entered is contrary to the weight of the evidence, that defendants did not defraud or overreach Mrs. Dunning when she was mentally and physically feeble, that the court should have granted a rehearing. No other or different questions are raised by plaintiff. Since the case was tried in the circuit court, there has been a substitution of attorneys, and defendants appeal.

1. It is contended plaintiff may not maintain the bill of complaint because it was necessary for plaintiff, before he could file a bill in this case, to restore or tender back to the defendants whatever was received by Mrs. Dunning upon the exchange of the properties in question.

Restoration or tender before suit is wholly superfluous as a prerequisite to a suit in equity for rescission or cancellation. This suit is one in equity for rescission of the contract made between the parties and for cancellation of the instruments made in pursuance thereof. *Jandorf* v. *Patterson,* 90 Mich. 40; *Witte* v. *Hobolth,* 224 Mich. 286; *Maurer* v. *Iden,* 242 Mich. 568; *Lightner* v. *Karnatz,* 258 Mich. 74; *Himebaugh* v. *Chalker,* 261 Mich. 80; 6 Pomeroy's Equity Jurisprudence (3d Ed.), p. 1162 *et seq.,* § 688.

2. It is not denied that the property received by Eliza Dunning from defendants was sold under a prior-existing mortgage lien before the commencement of this suit.

It is a general rule that where the property has been so sold, restoration or tender is superfluous as

a prerequisite to the commencement of suit for rescission. *Lewis* v. *White,* 16 Ohio St. 444; *Henninger* v. *Heald,* 51 N. J. Eq. 74 (26 Atl. 449) ; 2 Black on Rescission & Cancellation (1st Ed.), p. 1425, § 618.

3.   It seems to have been the established rule of the common law that it was proper that the person alleged to be mentally incompetent should appear before the chancellor for inspection. *Abbot of Strata Mercella's Case,* vol. 5, part 9, Coke's Rep. p. 40, folio 249, 31*a* (77 Eng. Rep. 765) ; 3 Blackstone's Commentaries (8th Ed.), p. 332. In case mental incompetency became involved in such a way that the mental condition of a person was to be determined by the jury, inspection by the jury was an allowable mode of acquiring knowledge on an issue of insanity. 1 Hale's Pleas of the Crown (1st Amer. Ed.), pp. 29, 33.   See, also, 2 Wigmore on Evidence (1st Ed.), p. 1358, § 1160.

4.   It was competent for the trial court to visit Mrs. Dunning. The fact she had been found mentally incompetent and a guardian had been appointed over her by reason of her mental incapacity was not sufficient to prevent her being sworn. *Evans* v. *Hettich,* 7 Wheat. (20 U. S.) 453, 470; *District of Columbia* v. *Armes,* 107 U. S. 519, 521 (2 Sup. Ct. 840); *Pittsburg & W. R. Co.* v. *Thompson* (C. C. A.), 82 Fed. 720; *Czarecki* v. *Seattle & S. F. Railway & Navigation Co.,* 30 Wash. 288 (70 Pac. 750); *Coleman* v. *Commonwealth,* 25 Grat. (66 Va.) 865 (18 Am. Rep. 711) ; *State* v. *Simes,* 12 Idaho, 310 (85 Pac. 914, 9 Ann. Cas. 1216) ; *People* v. *Enright,* 256 Ill. 221 (99 N. E. 936, Ann. Cas. 1913 E, 318) ; *State* v. *Berberick,* 38 Mont. 423 (100 Pac. 209, 16 Ann. Cas. 1077) ; *Cuesta* v. *Goldsmith,* 1 Ga. App. 48 (57 S. E. 983) ; *McKinstry* v. *Tuscaloosa,* 172 Ala. 344 (54 South. 629) ; *Bowdle* v. *Railway Co.,* 103 Mich.

272 (50 Am. St. Rep. 366, 4 Am. Neg. Cas. 180);
1 Wigmore on Evidence (2d Ed.), p. 912 *et seq.*,
§§ 492 to 498.

5.   James Gibbons appeared as attorney for plaintiff.   When plaintiff was upon the stand he said:

"Mrs. Dunning is weak in body, being 83 years of age.   It is not possible for Mrs. Dunning to come down to the courtroom.   It would be a hazardous thing to come here, from her health standpoint.   It is my desire to have this court interview Mrs. Dunning and see her, and I am saying this and qualifying my answer: If she had an opportunity to talk with the court, her answers even might be prejudicial to my situation in this case, but I think that insofar as the court has heard all of the evidence that has been submitted and heard all of our story, whether her conversation with the court would be detrimental to our side or not, it might clarify this atmosphere and assist the court in arriving at a true solution of this tangled problem, and for that purpose I would welcome an opportunity, if it could be arranged, that the court could talk with Mrs. Dunning."

There was colloquy in relation to the court viewing the property in controversy.   Mr. Gibbons suggested:

"I know it is the desire of the court to investigate such matters in order to have a clear understanding, and it is my suggestion that the court, together with the court reporter, Mr. King and Mr. Mettetal do that thing. * * * Outside of the testimony—or the interview with Mrs. Dunning, if the court will grant that interview, why that is our case."

Mr. King, for defendant, referring to the interview with Mrs. Dunning, said:

"It seems to me that that would be a *useless ceremony, in view of the fact she has been declared in-*

*sane.* \* \* \*  I have no objections to the court making the trip, if he feels that it is necessary, but *I do think the testimony of an incompetent person is not of much consequence.*"

"*The Court:* Well, we might go out, look at the property and interview this person, see what the result is.  Is that agreeable to you?

"*Mr. King:* Yes, your Honor."

The court, the court stenographer, plaintiff and defendants' attorney visited Mrs. Dunning.  She was not sworn, and it is contended her statement made in pursuance of this arrangement is improperly in the record and not proper to be considered.

Witnesses should give their testimony under oath. But, there was a waiver of the provisions of the law. And where the provisions of the law are waived in the conduct of a trial, they cannot afterwards be set up by way of objection to any step taken upon the footing of such waiver.  Bigelow on Estoppel (6th Ed.), p. 785.

Where one in possession of a legal right waives it, he is precluded from claiming anything by reason of it afterwards.  The waiver is equivalent, in effect, to an admission that it has been performed and is in a sense evidence of performance.  67 C. J. pp. 313, 314. One may waive his right to object to a particular class of evidence by stipulation.  *Walker* v. *Walker,* 64 N. H. 55 (5 Atl. 460).  Incompetent evidence, admitted without objection, must be allowed to have such weight and force as the triers of the facts see fit to accord to it.  *Farber* v. *Railway Co.,* 139 Mo. 272 (40 S. W. 932); *McVey* v. *Barker,* 92 Mo. App. 498.  A waiver of objection to competency made at one stage of the taking of testimony is a waiver during the progress of the proceedings.  Rapalje, Law of Witnesses (1st Ed.), p. 300.  Where a witness gives his testimony without being sworn, the adverse

party by not objecting thereto waives any objection to it. Bowers, Law of Waiver (1st Ed.), p. 409, § 416.

In *Thomas Trammell & Co.* v. *Mount,* 68 Tex. 210 (4 S. W. 377, 2 Am. St. Rep. 479), it is said:

"The appellants allowed the witness to give his testimony without being sworn, and thereby waived any objection to it on that account."

Where a party has given his assent to a specific act there is good reason for refusing to hear him complain of it. *Taylor* v. *Burnap,* 39 Mich. 739.

Where a party to a transaction induces another to act upon the reasonable belief that he has waived, or will waive, certain objections which he is entitled to assert, he will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled. 21 C. J. p. 1241.

Defendants had a right to insist upon Mrs. Dunning being sworn. It fairly appears that defendants' counsel waived the administration of an oath to Mrs. Dunning as a condition precedent to her testifying. He could at the time of the interview have insisted upon her being sworn. Not having done so, but having consented to her examination by the trial court without the administration of an oath, defendants are now estopped from questioning the admissibility of her testimony. To permit defendants here to repudiate what they acquiesced in in the trial court would not only be prejudicial to plaintiff but work a fraud on the court.

Mrs. Dunning was past 77 years of age, in a feeble condition of health both physically and mentally at the time of the transaction. She was no longer alert. She had no business education, little business experience, and limited knowledge. She had been a hard-working farmer's wife, used to working outdoors in

addition to running her household.  She had inherited from her husband a farm which by reason of its location and the growth of Detroit had increased substantially in value.  It had once been sold for $75,000 in paper promises, but the promises had not been performed, and she had to take the farm back. At the time of this transaction she was in necessitous circumstances, in need of ready money, and wanted to sell some of her land, and Asa Sherwood, who operated as a real estate broker in the transaction, says there were several years' back taxes upon the land, that she had no money and no income.

The nine acres of land in question which she owned were free and clear from all incumbrances unless there were back taxes upon them, and worth about $600 an acre.  In the transaction here they were valued at $5,300 by Mr. Sherwood and the real estate commission which he and Mrs. Robertson, who represented defendants, collected and divided was figured upon the basis of five per cent. of $5,300.  The property adjacent to it had in the boom days of Detroit real estate been sold for as high as $3,350 an acre.  The property was well located.

Defendants owned a parcel of real estate in an undesirable neighborhood, in a rundown condition, upon which were located some buildings more or less dilapidated, assessed for the purposes of taxation at $1,514, upon which there was a real estate mortgage of $2,300, an amount more than 50 per cent. greater than its assessed value, upon which payments were past due and upon which foreclosure was imminent. Defendants sought to realize something from this real estate.  Though they had been engaged in the real estate business themselves, they employed real estate brokers, one Mrs. Robertson and Asa Sherwood, who had long been acquainted with Mrs. Dunning and had transacted business for her and upon

whom Mrs. Dunning relied. Sherwood went to Mrs. Dunning and told her he had a buyer for nine acres of her land and that it would not all be paid down but that she would have an income at the rate of $55 a month and she, relying upon Mr. Sherwood's advice, decided to sell the property.

Defendants Hall, November 5, 1932, deposited $100 with Sherwood, the real estate dealer who was to put the transaction through for them, as a deposit upon the nine acres of land of Mrs. Dunning, and agreed to pay $300 in cash, down. Sherwood visited Mrs. Dunning and procured her acceptance of this deal, being careful to stipulate in the acceptance of the proposed contract by her for five per cent. commission on the sale of the property at a fixed price of $5,300. Mrs. Dunning had no attorney to represent her in closing this transaction, no independent advice from anyone competent to give it, and relied solely upon Sherwood who advised her to accept the deal. He was not representing Mrs. Dunning in the transaction, was not looking after her interests, and he did not protect her rights, did not advise her in her own interest, but represented himself only. His interest was solely in closing the deal and collecting the commission. He did not examine the abstract and although he claims to have visited the property which Mrs. Dunning was acquiring, he testified his examination was confined to the exterior of the premises and the inside of a small store located thereon.

Upon the real estate of defendants was a mortgage of $2,300, given to the bank, and the quarterly payment due thereon in default. The original terms of this mortgage provided for semi-annual payments of principal of $150, but the terms and conditions thereof were modified. The testimony indicates the mortgage at the time of this transaction provided for

quarterly payments of $75 upon the principal, together with the interest, due on the 8th day of each quarter, January, April, July, and October, and that October 4, 1932, this mortgage was in default $75 upon the principal.

Mrs. Hall, one of defendants, interviewed the bank in relation to the real estate mortgage, told it she was deeding the property to Mrs. Dunning who was to assume and agree to pay the mortgage, and she told the bank "that Mrs. Dunning understands that we are extending this mortgage for 5 years on the original terms." At the time the transaction was entered into, this real estate mortgage, in default as to principal, had by verbal agreement made by Mrs. Hall with the bank been extended for a period of five years upon the same terms and conditions as the original mortgage itself. The contract which was presented to Mrs. Dunning and accepted by her provided:

"It is understood and agreed that David Hall is to obtain a renewal of *this mortgage for five years at six per cent. interest with no principal payments* before turning this contract over to seller under this agreement."

It is a fair inference that Mrs. Dunning understood, if she understood anything, the real estate mortgage was to be extended for a period of five years, and that no payments upon the principal were to be made within that period. The clause in the contract was misleading. Instead of the extension providing for a renewal of the mortgage for five years at six per cent. interest, *with no principal payments to be made thereon during that period,* the extension was made upon the same terms and conditions as provided for in the mortgage, that is, for $75 in principal to be

paid quarterly, together with the interest thereon. It is a fair inference that Mrs. Dunning was deceived and misled thereby. Although it was represented to her that no principal payments were to become due or payable upon the mortgage within the period of five years, within 44 days after the deal was closed, February 9, 1933, Mrs. Dunning was informed by the bank the interest and one instalment of principal upon the mortgage was due January 8, 1933, and she was advised by the bank that the whole amount of the principal and interest of the mortgage could be declared due at once and the mortgage was subject to be foreclosed.

Mrs. Dunning, who had wanted by the sale of the nine acres of land to acquire money for her necessitous circumstances, assumed a substantial liability, because, for the property which she sold and which was worth about $5,300, she procured nothing except an equity in the real estate in question assessed at $1,514 for the purposes of taxation, subject to an outstanding mortgage of $2,300 with the accumulated interest and principal payments due and to grow due thereon, which mortgage was subsequently foreclosed, and upon the sale in pursuance of such foreclosure the mortgaged property was bid in by the bank at $2,995.37.

There is proof that Sherwood, upon whom she relied, advised her that it was a good transaction to enter into, and that he represented to her the real estate which she was acquiring was worth approximately $40,000, when as a matter of fact it was worth less than the incumbrance thereon.

Fleecing this old lady by such means out of $5,300 worth of property for which she acquired a worthless equity in real estate, mortgaged for nearly $1,000 more than it was assessed at, when she was

in a condition of ill health physically and mentally, does not commend itself to the court.

About all there is to this transaction, stripped of the verbiage contained in the record, is that the Halls had a "shoestring" equity in the real estate in question which they were about to lose on mortgage foreclosure by reason of their nonpayment of the principal upon the mortgage. Mrs. Robertson, who represented them, knew Sherwood, and Sherwood thought he could get the nine acres of land of Mrs. Dunning, free and clear from all incumbrances, and, without in any way protecting Mrs. Dunning's rights and interests, he advised her it was a good deal, when it was not only a worthless deal but an assumption, without consideration, of liabilities, and in pursuance of this transaction he and Mrs. Robertson split a commission of $265 which was all the interest either of them had in the transaction. Sherwood himself admits that what was left of the $300 paid down by the Halls, after he and Mrs. Robertson split the $265 in commission, went to pay taxes.

While Sherwood testifies Mrs. Dunning went to see the property and he himself was supposed to have been familiar with it, he admits his examination of the property was confined to the exterior thereof except that he himself was in the small store located thereon, and there is no proof that Mrs. Dunning ever examined in any way the property in question.

The statements of a grantor both before and after the execution of a deed are relevant and material when mental capacity, fraud, or undue influence are involved.

"It is said by the court in *Waterman* v. *Whitney*, 11 N. Y. 157 (62 Am. Dec. 71), that the 'mental strength and condition of the testator is directly in

issue in every case of alleged undue influence; and the same evidence is admissible in every such case, as in cases where insanity or absolute incompetency is alleged. It is abundantly settled that upon either of these questions the declarations of the testator, made at or before the time of the execution of the will, are competent evidence.' The question in that case was whether the same rule would permit the proof of subsequent declarations, and it was held it would." *Beaubien* v. *Cicotte,* 12 Mich. 459, 486.

"Such testimony is admissible as tending to show the mental state of the grantor at the time of the execution of the deed in question." *Noban* v. *Shoup,* 171 Mich. 191, citing *Haines* v. *Hayden,* 95 Mich. 332 (33 Am. St. Rep. 566); *Bush* v. *Delano,* 113 Mich. 321; 3 Wigmore on Evidence, § 1738.

"Subsequent declarations are admissible for the reason that the condition of mind ascertained at a date subsequent to the execution of the will may be presumed to have existed at a prior time. *Waterman* v. *Whitney,* 11 N. Y. 157 (62 Am. Dec. 71); *Beaubien* v. *Cicotte,* 12 Mich. 459; *Harring* v. *Allen,* 25 Mich. 505." *Haines* v. *Hayden, supra,* 346.

Transactions of this kind are voidable. *Wolcott* v. *Connecticut General Life-Insurance Co.,* 137 Mich. 309. And a court of equity is the proper tribunal in which to set them aside. *Moran* v. *Moran,* 106 Mich. 8 (58 Am. St. Rep. 462).

In 2 Pomeroy's Equity Jurisprudence (3d Ed.), p. 1727 *et seq.,* § 947, the rule sustained by the English and American authorities is thus stated:

"It is well settled that there may be a condition of extreme mental weakness and loss of memory, either congenital, or resulting from old age, sickness, or other cause, and not being either idiocy or lunacy, which will, *without any other incidents or accompanying circumstances,* of itself destroy the person's testamentary capacity, and *a fortiori* be ground for

defeating or setting aside his agreements and conveyances. It is equally certain that *mere* weakmindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own *free* will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. If, as is frequently if not generally the case, the mental weakness and failure of memory are accompanied by other inequitable incidents, and are taken undue advantage of through their means, equity not only may but will interpose with defensive or affirmative relief. Finally, in a case of real mental weakness, a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party.''

''It may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the *consideration given for the property is grossly inadequate,* a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside. * * * It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred.'' *Allore* v. *Jewell,* 94 U. S. 506.

In *Smith* v. *Cuddy,* 96 Mich. 562, it was said:

"Transactions of this nature are regarded by courts of equity with suspicion, and scrutinized with vigilance. The presumption is against the propriety of the transaction, and, as has been frequently said in our own cases, the duty of courts is to refuse judicial sanction to such an instrument until fully satisfied of the fairness of the transaction, and that the instrument is the intelligent act of the person executing it," citing *Seeley* v. *Price,* 14 Mich. 541; *Witbeck* v. *Witbeck,* 25 Mich. 439; *Wartemberg* v. *Spiegel,* 31 Mich. 400; *Barnes* v. *Brown,* 32 Mich. 146; *Duncombe* v. *Richards,* 46 Mich. 166; *Jacox* v. *Jacox,* 40 Mich. 473 (29 Am. Rep. 547); *Finegan* v. *Theisen,* 92 Mich. 173.

Indeed, "the equitable rule is of universal application, that where a person is not equal to protecting himself in the particular case, the court will protect him." *Connelly* v. *Fisher,* 3 Tenn. Ch. 382.

Where false representation as to value is intentionally made to a person ignorant of value with the intention that it shall be relied upon, it is fraudulent. *Pinch* v. *Hotaling,* 142 Mich. 521; *Steele* v. *Banninga,* 225 Mich. 547; *O'Neill* v. *Kunkle,* 244 Mich. 653; *Gugel* v. *Neitzel,* 248 Mich. 312; *Poloms* v. *Peterson,* 249 Mich. 306.

The principles indicated by the cases above-cited have been followed.

In *Hubert* v. *Traeder,* 139 Mich. 69, a deed was procured from Mrs. Hubert in settlement of a claim made against her. It was said of defendants:

"With certain defeat staring them in the face, they succeeded in obtaining a settlement very advantageous to them. They say that this settlement was sought by her, and not by them, but that is not plausible. Her counsel were not consulted, and she is

made to say that she did not want them to know of it. All this may be true, and yet the influence that brought it about may have been adroit, to the verge of fraud. We feel that it was so. It was too successful to have been entirely free from guile.''

''Where the simplicity and credulity of parties are taken advantage of by the shrewdness, overreaching, and misrepresentation of the other party, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, a court of equity may with propriety interpose.'' *Sorge* v. *Dickie,* 199 Mich. 251.

See, also, *Ferguson* v. *Perry Coal Co.,* 213 Mich. 197; *Styninger* v. *Courtright,* 229 Mich. 399.

Mrs. Dunning was aged and infirm, without legal advice; she relied upon Mr. Sherwood, who did not represent her but himself. Relying upon his advice that it was a good deal, she parted with $5,300 worth of real estate, free and clear of incumbrances, for a worthless paper equity in property assessed for $1,514 and mortgaged for $2,300, which mortgage was in default and foreclosure imminent. She wanted money to relieve her necessitous circumstances, and acquired extensive liabilities. The agreement for extension of the mortgage with the bank did not correspond with that which she accepted. All the money paid down was divided in real estate commissions. From the gross inadequacy of the consideration, the mental condition of Mrs. Dunning, the false representations made to her as to the benefits she would receive from the trade, the nature of the contract and other circumstances surrounding this exploitation of an ignorant and credulous old lady without independent advice, we think

the trial court arrived at a correct conclusion, and the decree of that court is affirmed, with costs.

BUTZEL, C. J., and BUSHNELL, SHARPE, CHANDLER, and McALLISTER, JJ., concurred with POTTER, J. WIEST, J., concurred in the result. NORTH, J., took no part in this decision.