## No. 14,357

Tubbs et al. *v.* Hilliard, Conservator of the Estate of Newell, a Mental Incompetent.
(89 P. [2d] 535)·

Decided April 3, 1939.

Messrs. Morrissey, Mahoney & Scofield, for plaintiffs in error.

Messrs. Van Cise, Robinson & Charlton, for defendant in error.

*In Department.*

Mr. Justice Bakke delivered the opinion of the court.
An action instituted by the next friend of Henry C. Newell to set aside his assignment of an interest in an estate on grounds of mental incompetency of assignor

and fraud of assignee. The lower court set aside the assignment, of which action no complaint is made; however, it also ruled that because of fraud, and the fact that the incompetent received no particular benefit from the consideration, no restitution need be made, and it is to reverse this latter ruling that the writ of error herein is prosecuted. Reference will be made to incompetent and plaintiffs in error by name.

Plaintiff in error Tubbs was in the money lending business, and, for a part of the time at least, while dealing with Newell, was president of the Garfield Industrial Bank. Schwartz was in the jewelry business, and engaged also in loaning money. *Schwartz v. Silvey*, 101 Colo. 336, 73 P. (2d) 994.

Newell was a great-grandson of the late Henry Bolthoff, and a brother of Newell who was plaintiff in error in the case of *Newell v. Tubbs*, 103 Colo. 224, 84 P. (2d) 820. As such great-grandson, he was entitled under the terms of the will of Bolthoff to a one-sixth interest in the residuum of the trust estate which was being administered by the Colorado National Bank. At the time of the assignment in question, December 17, 1934, the trust estate was valued at about $167,000, and Newell was twenty-three years of age. It is admitted, for the purposes of this case, that he was mentally incompetent on that date.

We deem it unnecessary to elaborate the dealings between Newell and Tubbs leading up to the assignment. It is sufficient to state that through several transactions Newell's debt to Tubbs' bank had been pyramided to nearly $1,800, while the bank had received nearly $2,400, which included a brokerage charge of $458.50, interest in the sum of $131.55, and an attorney's fee of $100. When the dividend checks from the estate were issued Tubbs would accompany Newell to the bank, and either cash the latter's checks and give him a part of the money, or deposit them to the credit of his bank and give Newell

some money. Tubbs admitted he kept no record of these transactions.

In the fall of 1934 there was a theatrical group operating in the state under the name of the Ward-Allen Productions, the chief promoters of which were Ward Montgomery and Miss Odile Allen. Tubbs first heard of and met these parties during a performance given by them at a meeting of one of the Denver luncheon clubs. The company was in financial straits and tried, without success, to borrow money from Tubbs.

Newell also was interested in theatricals and had a delusion that he could be a great actor. He felt his niche in life was to convey to the public an enduring moral lesson through the drama, and Tubbs was aware of this ambition.

On the morning of December 8, 1934, both Montgomery and Newell called at Tubbs' office. Whether the meeting was pre-arranged at the instance of Tubbs is somewhat obscure. Be that as it may, Newell and Montgomery were introduced by Tubbs and a conference followed between them concerning the show which the Ward-Allen Productions was then trying to promote in Pueblo. It was agreed that Newell would advance to the Ward-Allen Productions $125 immediately, and, at Tubbs' suggestion, Montgomery and Newell called on his, Tubbs', lawyer who prepared the written agreement, which is as follows:

"Denver, Colorado
"December 8th, 1934

"Mr. Henry C. Newell
"Denver, Colorado
"Dear Sir:

"In accordance with a conference had this morning regarding the staging of Ward-Allen Productions at Pueblo in the City Auditorium beginning December 13th, 1934, at which conference we advised you that we were in need of $125.00 which was to be advanced by you to us under the following conditions:

"Upon your giving us the $125.00 we are to make up a note signed by Ward Montgomery and Odile Allen in the sum of $125.00 with interest at 6% per annum, which note shall be a demand note. You shall have the privilege of being in the box office and getting the $125.00 back out of the first receipts, after Government tax has been paid.

"The consideration for this amount is the fact that you are contemplating becoming associated with us in further productions. If this is satisfactory to you, your acceptance shall constitute a contract between us.

"Very truly yours,
"Odile Allen
"Ward Montgomery

"Accepted:
"Henry C. Newell."

After the acceptance of this proposal Newell accompanied Montgomery to Pueblo, having been assured that he was to be given a part in the play, and while there Montgomery and two of the women of the troupe talked with him about becoming associated with them, and suggested that they incorporate the company which would assure him an opportunity of realizing his ambition of becoming an actor.

Sometime during Saturday afternoon, December 15th, Montgomery telephoned Tubbs from Pueblo. There is some dispute as to what the conversation was, but in part it was to the effect that the show had collapsed and the company was in need of funds. Montgomery requested a conference with Tubbs—for Newell, according to Tubbs' testimony—on the following day, which was Sunday. Tubbs informed him that he would not be in his office but that they could call on him at his home in Littleton, which they did on Sunday morning, and whether through design or otherwise, Schwartz was present. There is a sharp conflict between the testimony of Tubbs and Newell as to what was said during this meeting. Newell contends that both Tubbs and Schwartz advised him that

this was his great opportunity to realize his ambition of becoming an actor· and that they stated they would advance him the money in consideration of his assigning to them one-half of his interest in the estate. Tubbs then served some whiskey, Newell taking a drink. Tubbs afterwards took Newell into·the kitchen where they discussed the proposition of the sale by Newell of his interest in the Bolthoff estate. Tubbs contends he did not want to buy the interest. Newell asked Tubbs if Schwartz might buy it and· a conference between Schwartz and Newell took place in the kitchen. When they returned from the kitchen, Schwartz handed Tubbs a piece of paper on which was written ''$4000.'' Schwartz said he did not want to deal unless Newell would have his, Newell's, attorney pass on the deal. One of the women, who had advanced $100 to the company, suggested a lawyer who was agreeable to all concerned.

The next morning Newell, Montgomery and Miss Allen conferred with the suggested lawyer. There was talk of incorporation. They desired that the papers be drawn immediately, but were told the work could not be completed· until in the afternoon. Newell then informed the lawyer that he was selling one-half of his interest in the estate and was advised against doing so by the lawyer., Newell insisted on going through with the deal, so the lawyer accompanied him to the office of Tubbs' attorney, where an agreement was signed whereby Newell sold one-half of his interest to Tubbs and·Schwartz. Schwartz, as a side deal, sold Newell a diamong ring ''for the lady'' for $75.

Out of the $4,000 for which Newell parted with his one-half interest, Tubbs deducted $1,299.50 for alleged unpaid loans, attorneys fees and insurance premiums for insurance on Newell's life and gave Newell a check for $2,700.50. With this sum Newell opened a checking account in a Denver bank, being accompanied to the bank by Schwartz, Montgomery, Miss Allen and a Miss Hemberger, the woman who had advanced $100 to the

show company. Upon leaving the bank, all the parties, except Schwartz, went to Miss Hemberger's residence where Newell gave Miss Allen a check for $200 for "expenses" already incurred, one for $1,800 for running expenses of the company, and another for $150 which went for publicity.

The next day Newell, Miss Allen and Montgomery went down to the bank where Newell had his checking account and opened another account with the $1,800 in the name of Ward-Allen Inc., on which Miss Allen was to draw checks.

It was only a few days later, that Montgomery and Miss Allen left for parts unknown and nothing has been heard of them since. When Newell found time to take stock of what had happened, he had a suit of clothes, a few neckties and had made a down payment of $150 on a car out of the $2,700.50 he had received.

The name of the production in which Newell was to have had a part, and which collapsed in Pueblo, was "For Crying Out Loud."

It is urged that Tubbs and Schwartz had no occasion to, and did not, know of Newell's mental condition. On this point, their own alienist testified, "he has been definitely afflicted with this condition at least since 1930." That Tubbs must have known of Newell's affliction is a reasonable, if not an inescapable, inference.

If this was a case of mere mental incompetency, plaintiffs in error would have a just claim for recovery of the consideration which passed in the transaction if Newell still had the funds. But he lost practically the entire amount through parties with whom Tubbs and Schwartz brought him in contact, making it possible for them to defraud him.

We concede that it is a harsh rule that the law imposes in cases of this character, namely, that where the incompetent has parted with the consideration given him and no part thereof remains in his hands, he is not obliged to restore the other party to the status quo. 9 Am. Jur.

386; 12 C. J. S. 1009. To hold otherwise in this case "would be but to guarantee that although the attempt to fraudulently procure the property of an insane man might fail, yet the perpetrator of the attempt would be protected by law from any loss in the transaction." *Ronan v. Bluhm,* 173 Ill. 277, 50 N.E. 694. Quoted in *Walsh v. Stockyards Bank,* 340 Ill. 57, 66, 172 N.E. 25.

Notwithstanding his incompetency, under the circumstances here appearing, Newell was entitled to testify. *Wilkinson v. People,* 86 Colo. 406, 282 Pac. 257. The record discloses, and the alienists freely admitted, that his memory was good.

It is clear to us that the trial court was justified in finding that, "The testimony is so clear and so convincing as to the mental incapacity of this plaintiff at the time the assignment was entered into and long prior thereto, * * * that the defendants knew of this mental incapacity and by their unconscionable dealings with the plaintiff have precluded themselves from obtaining any relief in the way of having the consideration restored to them." The record supports the conclusion.

The judgment is affirmed.

MR. CHIEF JUSTICE HILLIARD and MR. JUSTICE BURKE concur.