Rena Bumgardner, *Committee, etc. v.* Sam Corey

(No. 9316)

Submitted February 25, 1942.  Decided May 26, 1942.

Rose and Kenna, Judges, dissenting.

*M. O. Litz* and *H. D. Rollins,* for appellant.
*L. Steele Trotter, A. P. Hudson* and *B. J. Pettigrew,* for appellee.

LOVINS, JUDGE:

Rena Bumgardner, committee for W. C. Rollins, an incompetent person, instituted this suit in the Circuit Court of Kanawha County against Sam Corey for the purpose of setting aside a deed executed on November 21, 1936, in which W. C. Rollins was grantor and Corey, the grantee. It is alleged that Rollins was induced or coerced into the execution of the deed by wrongful threats of litigation by V. T. Harrison, Rollins being mentally incompetent at the time. After a full hearing on bill, demurrer, answer and depositions, the trial court denied the relief prayed, for reasons hereinafter set forth, and dismissed plaintiff's bill, from which action of the trial court, plaintiff was granted this appeal.

W. C. Rollins, about sixty years of age at the time of the institution of this suit, was reared on Fisher Ridge in Jackson County. From 1918 until November, 1930, he was employed as a day laborer by the Appalachian Electric Power Company. During the year 1931, he married Cora Pauley and they resided on her farm on Camp Creek in Kanawha County, where, it is alleged, she expended all or the greater part of his life savings, amounting to three or four thousand dollars, in the improvement thereof. It is shown that Rollins suffered for years from a progressive mental deficiency, described as sclerosis of the radial and temporal arteries, the development of which increased while he was at Camp Creek until he became practically blind. In January, 1936, his brother, G. L. Rollins, took him to the home of his sister, Rena Bumgardner, in Jackson County because of his mental and physical condition and the alleged mistreatment by his wife, who, a few days thereafter, lost her life in a fire which destroyed their home. In March, 1936, W. C. Rollins was taken to the home of his brother, G. L. Rollins, on Fisher Ridge, where he has remained except for a period of some nineteen months from March, 1937, to October, 1938, when he resided with relatives of his wife, in Poca District, Kanawha County.

As indicative of his mental deficiency, during the time he was at Camp Creek and about the time of the execution of the deed under attack herein, certain lay witnesses testified that in their opinion, he was not competent. It is also shown that W. C. Rollins was unstable and flighty in conversation, repeating matters or changing abruptly the subject of conversation, and continually asking the names of old acquaintances with whom he was conversing; that he attempted suicide various times, that he threatened to "make a sieve" out of the roof of his wife's home with his pistol; that he "cried like a baby" on numerous occasions, when his wife whipped him with a rope, when G. L. Rollins left him at the Bumgardner home, when he was taken to the home of G. L. Rollins and when Delbert Pauley moved out of the Poca District residence; that he would offer to sell his property and then refuse to sell it at the price he had fixed; and that his wife and the neighbors at Camp Creek on numerous occasions said he was crazy. A neurologist, Dr. A. A. Wilson, examined W. C. Rollins in January, 1939, and found that he was not competent at that time. In answer to a hypothetical question setting forth the peculiarities hereinbefore mentioned and taking into account his examination and interview, Dr. Wilson also stated that, in his opinion, the incompetency he found in January, 1939, was present at the time of the incidents referred to in the question.

On the question of mental capacity, the testimony of numerous witnesses for defendant was generally to the effect that W. C. Rollins was competent to transact business, nothing indicating mental incompetency being observed by such witnesses although Lela Pauley, with whom W. C. Rollins resided in 1937 and 1938, testified that she had suggested to him and to "his people" that he ought to have someone to look after his business. Dr. G. C. Robertson, a general practitioner, who examined W. C. Rollins in 1941, testified that his physical condition was very bad, his eyesight was impaired and that he had hyper-tension and dilated heart. Dr. Robertson further testified that Rollins could transact business on the date of his exam-

ination, and that he could not say that Rollins was insane.

On March 10, 1936, W. C. Rollins and his brother, L. P. Rollins, owners of a tract of land in what is known as the Sissonville Gas Field, executed a lease thereof to the Columbian Carbon Company. During the summer of that year, while W. C. Rollins was living with his brother on Fisher Ridge, Delbert Pauley, a nephew of his then deceased wife, brought him to Charleston where they met V. T. Harrison, an unlicensed dealer in real estate, and discussed a sale of Rollins' undivided interest in the leased tract. It was proposed that Harrison sell the same for $800.00 and receive five per cent of the sale price as his commission. In the latter part of July, 1936, Harrison began negotiations with Sam Corey in Charleston, pursuant to which Harrison, Corey and Joe Moore inspected the land on August 15, 1936. While on this inspection trip, Corey expressed some doubt as to Rollins' competency to make a deed, according to the testimony of Ida Rollins, W. C. Rollins' sister-in-law, who resides on the land involved herein. This is denied by Corey, but he testified that prior to the sale, "almost I was afraid to buy it." About ten days later Corey entered into an agreement with Harrison that he would purchase the interest of W. C. Rollins for $1,000.00. However, when Harrison, Pauley and Moore went to Fisher Ridge and told Rollins about the agreement, he informed them he was "out of the notion" of selling his interest. This was followed by several unsuccessful attempts to bring Rollins to Charleston for the purpose of making the sale to Corey. On one occasion, when Rollins reiterated that he was not inclined to sell and added that he desired to go to Charleston to see his doctor, Harrison suggested that he go with Pauley, Moore and himself, to which suggestion Rollins assented. On this trip to Charleston, Rollins said that he would not sell his interest under any consideration, and returned to Fisher Ridge the next day, after seeing his physician. In November, 1936, Moore returned to Fisher Ridge, and told Rollins and Pauley that Rollins' lawyer, W. H. Pettry, wanted to see him, whereupon, they came to

Charleston. While waiting in Pettry's outer office, Rollins told Pauley that Moore "needn't follow him around * * * he was not going to sell the place." Pettry talked with Rollins privately, after which Rollins told Pauley that Pettry said that Harrison was going to sue him for his commission of $200.00, if he did not sell, adding that "it looks like I'm going to have to sell it." Rollins and Pauley then went to lunch, during the course of which Rollins told Pauley that he didn't know what to do about the threatened Harrison suit, and that he was afraid that Harrison would take everything he had. After lunch, Rollins and Pauley returned to Pettry's office where they met Harrison, Corey and an attorney apparently representing Corey, who argued with Pettry that Harrison could enforce collection of commission on the sale of the land. The deed was thereupon prepared and Rollins' signature was evidenced by his mark, made by Pettry while Rollins touched the pen held by Pettry. Harrison testified that Pettry asked Rollins at that time, "Is this what you want to do?", to which Rollins answered affirmatively. The notary, who took Rollins' acknowledgment to the deed, testified that he did not observe anything wrong with him although it was his impression that his eyesight was somewhat impaired. For this transaction, Rollins received $150.00 cash and $650.00 in notes in the amount of $25.00 each, payable monthly from date of the sale, and Harrison received $50.00 cash and $150.00 in similar notes. After the parties had left Pettry's office, Harrison gave Pauley $25.00, saying, "We had to come and get you before we could get him in here."

The trial court found: (a) That the record does not show that Rollins was so mentally incompetent that his mental incapacity alone would furnish a basis for the setting aside of the deed in question; (b) that Harrison's threat of suit to collect a commission was not made in good faith and that in view of Rollins' condition at the time, Harrison's conduct constituted such duress as would entitle Rollins to cancellation of the deed to Corey, if Corey is bound by Harrison's wrongful act; and (c) the

record does not justify the finding that Corey knew of or sanctioned the duress applied by Harrison to require Rollins to execute the deed.

Appellant contends that the findings as to mental capacity and Corey's knowledge of Harrison's duress are erroneous, while appellee argues that Rollins' mental capacity for execution of the deed was amply sufficient; that the record does not show coercion or improper influence; that if such existed Corey is not responsible therefor or chargeable therewith; that the price paid by Corey represented the market value of the property; and that plaintiff is guilty of laches.

With the first two findings of the trial chancellor, as indicated, we are in agreement. Rollins' mental and physical infirmities, as shown by this record, do not establish total incapacity, and are insufficient to overcome the presumption of mental capacity at the time of the execution of the deed. *Teter* v. *Teter,* 59 W. Va. 449, 53 S. E. 779; *Burkle* v. *Abraham,* 112 W. Va. 257, 164 S. E. 150. On the question of duress, it should be noted that the earlier requirements of common-law duress have been enlarged by the courts, both law and equity, to include "any wrongful acts that compel a person to manifest apparent assent to a transaction without his volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction." Restatement of Contracts, Sec. 493, Williston on Contracts, Rev. Ed. Sec. 1603. Formerly, the term "duress" was limited to acts causing personal restraint, fear of personal injury or imprisonment. *Simmons* v. *Trumbo,* 9 W. Va. 358, although as early as 1885, this Court had relaxed the rigidity of the original rule. See *West Virginia Transportation Co.* v. *Sweetzer,* 25 W. Va. 434. The cases of *Whittaker* v. *Improvement Co.,* 34 W. Va. 217, 12 S. E. 507, and *Mullens* v. *E. A. Searls Co.,* 69 W. Va. 790, 72 S. E. 1089, hold that the threat of civil suit is not legal duress. However, where such threat is not made in good faith, that is "if the threat is made with the consciousness that there is no real right of action and the purpose is coercion, a payment or contract induced

thereby is voidable." Williston on Contracts, Rev. Ed. Sec. 1606.

Harrison, in his deposition, stated that he told Rollins that he would sue him, after Rollins had said that he would "just leave the deal go by", and in answer to the next question by counsel for appellee, "Was there anything else to your knowledge that induced or coerced the old gentleman to sign this deed?", Harrison said, "No, sir, not a thing, as I know of." It appears that Rollins was troubled about the threatened suit for $200.00, and it is clear that if Harrison had any claim for a commission, based upon an agreement with Rollins, it was for 5% of $800.00. The trial chancellor so found, discrediting, in view of Harrison's character as shown by the record, his testimony as to Rollins' voluntary acceptance of the change in the agreement whereby the sale price was raised to $1,000.00, and Harrison's commission to $200.00. Despite counsel's assertion in the brief that Harrison's testimony shows that there was "complete understanding" between himself and Rollins, we are inclined to accept the views of the trial chancellor in this regard, especially since counsel do not indicate wherein the chancellor erred on this point, other than to say that it was an "erroneous conclusion", and an "apparent misunderstanding." Neither are we impressed with the argument that Rollins was greatly benefited by receiving $800.00 instead of $760.00 due to Harrison's so-called generosity; it suffices to say that counsel rely upon Harrison's testimony that Rollins said he was "perfectly satisfied" with the deal. ·

We have followed the trial court in its finding that mental incapacity alone would not furnish a basis for setting aside the Rollins deed. However, we believe the record portrays a physical and mental condition of the grantor which rendered him a ready victim for the duress employed herein. The true test is whether the will of the person threatened is overcome by wrongful threats, inducing him to do an act which he would not otherwise have done, and which he was not bound to do. The age, capacity, and all the attendant circumstances must be

considered. Williston on Contracts, Rev. Ed. Sec. 1605. The record shows a series of attempts to induce Rollins to make the conveyance, and his repeated assertions that it was not his desire to do so, which assertions continued up to the moment of the threat of suit for a commission in an amount five times that originally contemplated.

Our disagreement with the conclusions of the trial chancellor arises on the question of Corey's knowledge of the duress applied by Harrison. "The general rule that a contract will not be set aside because of the duress of a third party, unless the obligee has knowledge of, or consents to, the coercion, has been applied to deeds." 62 A. L. R. 1479, 4 A. L. R. 868; *Dunfee* v. *Childs,* 59 W. Va. 225, 53 S. E. 209. According to the Restatement of the Law of Contracts, Sec. 496, 477, duress by a third person renders a transaction voidable by a party induced thereby to enter into it if the other party thereto "has reason to know" of the duress "before he has given * * * in good faith something of value in the transaction." In *Rodes* v. *Griffith,* 102 W. Va. 79, 135 S. E. 244, 246, we held that facts and circumstances may *"prima facie* impute notice" of duress exercised by a third person to the person benefited thereby without actual knowledge.

Corey testified that after he agreed to purchase Rollins' interest for $1,000.00, about August 5th or 10, 1936, "for a while they dragged on with it for some reason and I was not feeling like buying the farm, but it went on, I guess, about two or three weeks or a month, maybe and Trevy (Harrison) called me and said I had promised to buy that farm and to come up to Mr. Pettry's office." It is noted that the occasion of the call to Pettry's office was November 21, 1936, more than three months from the time Corey had agreed to purchase, and during which time the efforts to get Rollins to sell had been met with his refusals. This testimony of Corey's with his statement that "almost I was afraid to buy it", indicates that there was some question in his mind as to the regularity of the transaction with Rollins. In spite of the fact that they "dragged on for some reason" and the expressed ap-

prehension as to the purchase, Corey says, "I just done all the business with that man, (Harrison) I never had occasion to talk to anyone else about it", and that the first time he saw Rollins was the day the purchase was consummated. The law imputes to a person knowledge of facts of which the exercise of common prudence and diligence must have apprised him; whatever fairly puts a party on inquiry is regarded as sufficient notice where the means of knowledge are at hand. *Pocahontas Tanning Co.* v. *St. Lawrence Boom & Mfg. Co.,* 63 W. Va. 685, 60 S. E. 890. We believe that, having the doubts as expressed by Corey himself, he can not now claim protection as an innocent purchaser for value when, in the exercise of common prudence and diligence, he could have ascertained the weak and vacillating mental condition of Rollins and the means used by Harrison to force the sale. Since, however, he chose to do "all the business" with Harrison, we must hold him with constructive knowledge of the duress here employed.

There is evidence to the effect that an attorney, who apparently was looking after Corey's interest in closing the transaction, argued with Rollins' counsel, in his presence, that Harrison could enforce collection of his commission, but it is not clear that any knowledge of the duress employed by Harrison came to Corey's representative from the argument or negotiations concerning the sale of the land, and, as hereinbefore indicated, we ground our decision on the actual or imputed knowledge of Corey.

We do not believe that this suit is barred by laches. In the first place, laches can not be imputed to one of unsound mind. *Trowbridge* v. *Stone's Adm'r.,* 42 W. Va. 454, 26 S. E. 363. Laches is inexcusable delay in asserting a right, an equitable defense determinable by particular facts, but the term implies knowledge of one's rights. The very fact that Rollins was pliant and surrendered to the threats of Harrison shows that he had no conception of the necessity for promptness in asserting his rights. This suit was instituted on the same day that Mrs. Bumgardner

was appointed as committee for Rollins. But, it is contended, the committee was appointed because of the development of a gas field in the vicinity of the property. We do not believe the record is sufficient to support this contention of appellee. The property was under lease for oil and gas development at the time the deed was made and the testimony shows that the nearest well to the property in question in November, 1936, was two and three-quarter miles away; no well had been completed in closer proximity at the time this suit was instituted.

For the reasons stated, the deed in question will be cancelled and set aside, but appellant is not entitled to such relief until Corey has been reimbursed for money paid to Rollins in cash and in satisfaction of the purchase money notes, principal and interest, together with interest on the principal amounts so paid from date of payment.

Accordingly, we reverse the decree of the Circuit Court of Kanawha County, and remand the cause for further proceedings consistent with this opinion.

*Reversed and remanded.*

ROSE, JUDGE, dissenting:

I did not concur with the majority of the Court in the original decision of this case, and would now grant a rehearing.

The plaintiff based her bill on the two conventional grounds of incompetency of her ward and of duress leading to the execution of the deed to the defendant Corey. By far the greater part of the testimony for both the plaintiff and the defendant is on the question of the mental competency of the plaintiff's ward Rollins. The trial chancellor found specifically that, although his mind was shown to be sub-normal, the evidence failed to prove him to be so defective mentally as to justify setting aside the deed in question on that ground alone. With this decision of the trial court the members of this Court are in unanimous agreement. As to the alleged duress, the court below held that this charge was proved, but that

it was exerted exclusively by the broker whom Rollins had employed and certain of his pretended friends, and that Corey, the grantee, had no connection therewith. Therefore, restoration of the property from Corey to Rollins was denied. In this I believe the trial chancellor was correct.

Corey's connection with the duress was sought to be established by what his attorney had said and done at the time of the closing of the transaction and by what Corey himself then knew, or, by the exercise of the diligence of an ordinarily prudent man, could have ascertained. The court below, and this court as well, fully exonerate the attorney in question. Hence, the plaintiff's case must stand wholly on what Corey knew or should have known of the duress under which Rollins acted.

It is stipulated that the wife of a brother of Rollins would have testified that upon the occasion of Corey's visit to the farm for the purpose of examining it, in company with the broker undertaking to sell for Rollins, and another, she told them "that they had better see his sisters, Mrs. Rena Bumgardner and Mrs. Anna Mathews, before buying the property since they were taking care of him (Rollins) and that she had heard his mind was not right; that one of the men, whom she believes to have been Corey, said he would not have the land without a court deed; * * *." But this is totally denied by Corey and the two men with him, and, even if admitted to be true, went only to the claim that Rollins was incompetent, which we have found to be ill-founded.

The only other compromising knowledge charged against Corey is from his own mouth. He testified as follows:

"Q. In your opinion did he understand this transaction that he was entering into with you?

"A. Yes, sir. The fact of the matter almost I was afraid to buy it and he come down when I took that paper to show Mr. Barnhart—they all

come down with me. He said O. K., and I didn't see nothing wrong with him at all, just like anybody else.

"Q. Was Delbert Pauley along with him?

"A. Yes, Delbert Pauley and Mr. Harrison were together—I mean Delbert and Mr. Rollins."

There is not another word in the evidence by which it is claimed that any guilty knowledge in Corey is shown. There is no dispute that he never had seen Rollins before. There is no claim in the evidence that he personally was guilty of any duress, or that he had any intimation that duress was being exercised by anybody. The plaintiff's whole case rested upon these words of Corey, "The fact of the matter almost I was afraid to buy it". Therefore, this sentence must be weighed. Corey was testifying about the execution and delivery of the deed. Was he afraid of the incapacity of Rollins? If so, his fear was unfounded. Was he suspicious of duress? There is not the slightest suggestion in the record that he had any part in, or knowledge of the duress which we have found, or of any fact or circumstance which would, even to the most prudent man, indicate that Rollins was being coerced. Then why did he hesitate? The context gives a perfect answer. The evidence shows that there had been a sharp disagreement between the lawyers representing Rollins and Corey, respectively, about the form of the deed. That prepared by the lawyer acting for Corey had been rejected by the lawyer for Rollins, who had prepared another. Then Corey says, "I took that paper to show Mr. Barnhart—they (Rollins and Pauley) all come down with me. He (Barnhart) said O. K.," and that he, Corey, then accepted the deed, paid the cash, and executed the notes. His hesitancy would seem to have arisen solely over the controversy about the form of the deed, but whether this is the correct construction of his own language or not, the ambiguous words "almost I was afraid to buy it", are too frail a basis for setting aside

the deed. Deeds are not set aside on suspicion alone, or on ambiguous expressions in the testimony.

The other facts in the evidence do not strengthen plaintiff's case. There was no duress when Rollins offered his property for sale. If the offer by Rollins and the acceptance by Corey had been in writing, a court of equity would have enforced specifically the contract, instead of relieving against it. In executing the deed, Rollins had full advice and assistance of counsel. Further, the plaintiff showed no interest in the matter until gas developments made the land enormously valuable. When the deed was executed the nearest well was two and three-quarter miles distant, while at the time the suit was brought at least seven wells were completed within one-quarter to one and a half miles from the Rollins land and producing from thirteen to twenty million cubic feet of gas per day, and a well was being drilled on the tract itself. The plaintiff frankly says, "We decided that he had given too much away for nothing", in explanation of her activity in the matter. The adjudication of insanity was plainly a friendly proceeding and took place the day before this suit was brought. A court of equity may reasonably scrutinize vigilantly suits brought by the relatives of an alleged incompetent to set aside his deed, after there has been a great increase in the value of the property—a move too often for their own interests, rather than his.

It is also to be noted that Rollins was not called as a witness. He is potentially the most important witness in existence. True, he has been adjudged insane, but such adjudication does not render him incompetent as a witness. At most it is only *prima facie* evidence against his present capacity to testify. If he can recall and narrate past events with reasonable accuracy and retains an appreciation of the solemnity of the oath, he may give evidence. *People* v. *Enright,* 256 Ill. 221, 99 N. E. 936, Ann. Cas. 1913 E, 318; *City of Covington* v. *O'Meara,* 133 Ky. 762, 119 S. W. 187; *Weeks* v. *State,* 126 Md. 223, 94 A. 774; *Barker* v. *Washburn,* 200 N. Y. 280, 93 N. E. 958, 34 L. R. A.

(N. S.) 159, 14 Am. St. Rep. 640; *Martin* v. *Hover,* 60 Mont. 302, 199 P. 694; *Lanier* v. *Bryan,* 184 N. C. 235, 114 S. E. 6, 26 A. L. R. 1488; *Abbott* v. *Columbia Mills Co.,* 110 S. C. 298, 96 S. E. 556; *U. S. ex rel. Lo Pizzo* v. *Mathues* (C. C. A.) 36 F. (2d) 565; *Conoway* v. *State,* 171 Ga. 782, 156 S. E. 664; *Missouri, etc., Ry. Co.* v. *Embrey,* 168 Okla. 433, 33 P. (2d) 481; *Commonwealth* v. *Kosh,* 305 Pa. 146, 157 A. 479; In re Degnan, 122 N. J. Eq. 470, 194 A. 789; *State* v. *Braden,* 56 Ohio App. 19, 9 N. E. (2d) 999; *Tubbs* v. *Hilliard,* 104 Colo. 164, 89 P. (2d) 535; *Mettetal* v. *Hall,* 288 Mich. 200, 284 N. W. 698; *People* v. *Ives,* 17 Cal. (2d) 459, 110 P. (2d) 408.

Why did the plaintiff not call Rollins as a witness? In all probability because his evidence would not have tended to sustain the plaintiff's case. So far as the evidence shows, Rollins has never, by any word or act, indicated that he, in the end, was dissatisfied with the deed to Corey, or expressed any regret at his own action in executing that deed, or uttered any protest against any thing that was done leading to it. On the contrary, at the time of the institution of this suit, he had collected each month, for nineteen months, one of the twenty-five dollar purchase money notes which he had accepted for the conveyance. He was apparently perfectly content with the bargain, and his collection of these notes tends powerfully toward a ratification of the conveyance sought to be set aside. For a deed made under duress is not void but voidable only, and may be ratified. *Schee* v. *McQuilken,* 59 Ind. 269; *Bodine* v. *Morgan,* 37 N. J. Eq. 426; *Brown* v. *Worthington,* 152 Mo. App. 351, 133 S. W. 93; *Bushnell* v. *Loomis,* 234 Mo. 371, 137 S. W. 257, 6 L. R. A. (N. S.) 1029; *Miller* v. *Minor Lbr. Co.,* 98 Mich. 163, 57 N. W. 101, 39 Am. St. Rep. 524; *Rose* v. *Owen,* 42 Ind. App. 137, 85 N. E. 129; *Willett* v. *Herrick,* 258 Mass. 585, 155 N. E. 589; *Ferrari* v. *Escambia County B. of H.,* 24 Fla. 390, 5 So. 1; *Miller* v. *Davis' Estate,* 52 Colo. 485, 122 P. 793; *Augusta Motor Sales Co.* v. *King,* 36 Ga. App. 541, 137 S. E. 102; *Kline* v. *Kline,* 14 Ariz. 369, 128 P. 805; *Hendricks* v. *Stark,* 99 Fla. 277, 126 So. 293.

Nor does the subsequent adjudication of Rollins as insane affect this principle or conclusion. We have found him competent when the deed was made. He was found insane on June 13, 1939, but such adjudication raises no presumption of insanity prior to that date. "Insanity, when once established, is presumed to have continued; but there is no presumption of such status at a period ante-dating that on which it is established." *Hentz* v. *Wallace's Admr.*, 153 Va. 437; 150 S. E. 389. See also: *Shores-Mueller Co.* v. *Palmer*, 141 Ark. 64, 216 S. W. 295; *Nichols* v. *Pool*, 47 N. C. 23; *Rowan* v. *Hodges* (Tex. Civ. App.), 175 S. W. 847; *Avery* v. *Avery*, 42 Cal. App. 100, 183 P. 453; *Lilly* v. *Waggoner*, 27 Ill. 395; *Huffaker* v. *Brammer*, 193 Ky. 267, 235 S. W. 727; *Small* v. *Champeny*, 102 Wis. 61, 78 N. W. 407.

In the face of these neutralizing and over-balancing facts and circumstances, the exceedingly narrow and frail case made out by the plaintiff, in my judgment, does not justify a decree in her favor.

Judge Kenna joins in this note.

LOVINS, JUDGE, upon petition for rehearing:

It is asserted in the petition for rehearing that the opinion herein erroneously states that "no well had been completed in closer proximity at the time this suit was instituted". This statement is a portion of a sentence referring to the fact that the testimony shows that the nearest well to the property of Rollins, in November, 1936, was two and three-quarter miles therefrom and there is nothing in the testimony in this record to indicate that the statement to which objection is made is incorrect. To reveal the error in the statement, it is necessary to refer to an unofficial map, introduced in evidence by appellant after the symbols thereon had been explained, and to scale the same. The only facts which were explained as appearing on the map were those relating to the existence of producing wells in November, 1936, and which facts were developed by counsel for appellee upon cross-examination of the witness for appellant who identified the

map. Without a stipulation or agreement, we do not believe that we are required to search an unofficial map 'for facts not developed by the testimony of a witness and given in connection therewith. Such a map, to be of any value to the court, must be supported by the testimony of a witness. *Prairie Oil & Gas Co.* v. *Laskey*, 173 Okla. 48, 46 P. 2d 484; Wigmore on Evidence 3rd Ed., sec. 789.

We believe that any error in the statement originally made will be corrected by amending the same to read as follows: "The testimony shows that the nearest well to the property in question in November, 1936, was two and three-quarters miles away; the testimony does not show that any well had been completed in closer proximity at the time this suit was instituted." Such correction is not sufficient to warrant any change in our holding.