HOLLAND v MICHIGAN NATIONAL BANK-WEST

Docket No. 86268. Submitted May 6, 1987, at Grand Rapids. Decided February 2, 1988.

Donald and Cherie Holland obtained a loan from Michigan National Bank-West in 1975 to finance the purchase of a franchised business and to cover its setup and operational costs. The Hollands executed a promissory note, a second mortgage on their home to secure the loan, and a sworn statement that they were an unincorporated individual business entity and that the proceeds of the loan would be used solely for business purposes. In 1980, the Hollands sold the business to purchasers who agreed to assume the outstanding balance on the loan from Michigan National but required the Hollands to remain liable under the Michigan National loan. By 1982, the loan agreement, which originally required repayment in monthly installments, had been modified into a one-year note with interest set at three percent plus the consensus New York prime rate but not less than eleven percent. The business' new owners ceased making payments on the loan in 1982 and Michigan National subsequently informed the Hollands that it would commence foreclosure proceedings pursuant to the second mortgage. Prior to the foreclosure sale, the Hollands brought an action in Kalamazoo Circuit Court against Michigan National. Plaintiffs sought a declaration that defendant was without statutory authority to write a second mortgage in 1975 and that the interest rate was usurious. Plaintiffs also sought an order enjoining defendant from proceeding with foreclosure. The trial court, John E. Fitzgerald, J., issued a temporary restraining order which was later changed by stipulation to a preliminary injunction. Following a bench trial, the trial court ruled that the second mortgage was valid and that

REFERENCES

Am Jur 2d, Banks § 692.

Interest and Usury §§ 41, 63-68, 241.

Mortgages §§ 554, 630, 772.

Construction and application of statutes expressly protecting borrowers in second mortgage transactions. 43 ALR4th 675.

Usury in connection with loan calling for variable interest rate. 18 ALR4th 1068.

the rate of interest charged on the loan was not usurious since the loan was made to a business entity for commercial purposes. The trial court set aside its injunctive order and entered a judgment in favor of defendant for $14,139.52 in unpaid principal and $5,340.45 in accrued interest, with a period of redemption extending for six months from the date of judgment. Plaintiffs appealed.

The Court of Appeals *held:*

1. Since 1974, when 12 USC 371(a) was amended, national banking associations such as defendant have been authorized to accept second mortgages on real estate. The trial court therefore correctly determined that defendant was permitted by statute to accept plaintiffs' second mortgage.

2. The interest rate on the loan in this case was not usurious. Under the business entity exception to the usury statute, any state or nationally chartered bank can extend credit to any business entity at any rate of interest agreed to in writing. In this case, plaintiffs came within one of the statutory definitions of "business entity" as they were natural persons who furnished to the extender of credit a sworn statement in writing specifying the type of business and business purpose for which the proceeds of the loan were used. Plaintiff Cherie Holland's participation in the venture, which was limited to being a signatory to the promissory notes and mortgage, did not disqualify the loan from the business entity exception to the usury statute.

3. Plaintiffs' statement as to the type of business and business purpose for which they sought the loan did not fully comply with statutory requirements since plaintiffs did not raise their right hands and swear to the truth of the statement before the person who notarized the statement. However, in view of the fact that plaintiffs do not dispute that the signatures on the statement are theirs or challenge the veracity of the statement, the failure to comply with the formalities regarding sworn statements did not invalidate the statement.

4. The trial court's findings as to the amount of principal outstanding or interest accrued were not clearly erroneous.

5. The trial court correctly determined that the applicable period of redemption in this case was six months. Defendant's counterclaim had changed foreclosure from one by advertisement to one by judicial proceedings, and where foreclosure is by judicial proceedings the statutory redemption period is six months.

Affirmed.

1. BANKS AND BANKING — NATIONAL BANKING ASSOCIATIONS — SECOND MORTGAGES.

A national banking association has statutory authority to accept second mortgages on real estate (12 USC 371[a]).

2. CONTRACTS — USURY.

The rate of interest on a loan may not exceed seven percent per annum unless the loan comes under one of the exceptions to the usury statute (MCL 438.31; MSA 19.15[1]).

3. CONTRACTS — USURY — BUSINESS ENTITY EXCEPTION.

A state or nationally chartered bank can extend credit to a business entity at any rate of interest agreed to in writing notwithstanding the provisions of the usury statute, but subject to the provisions of other state and federal statutes (MCL 438.61; MSA 19.15[71]).

4. CONTRACTS — USURY — BUSINESS ENTITY EXCEPTION.

A business entity, for purposes of the business entity exception to the usury statute, is (1) any corporation, trust, estate, partnership, cooperative or association, or (2) any natural person who furnishes to the extender of the credit a sworn statement in writing specifying the type of business and business purpose for which the proceeds of the loan will be used; the business entity exception does not apply where the extender of the credit has notice that the person signing the sworn statement will not be engaged in the business indicated (MCL 438.61; MSA 19.15[71]).

5. CONTRACTS — USURY — BUSINESS ENTITY EXCEPTION.

The appropriate focus of an inquiry into whether the business entity exception to the usury statute applies to a loan is not with the roles of the parties to the loan, but with the loan as a whole; thus, the exception may apply where the participation of one of the borrowers does not extend beyond being a signatory to the loan agreement.

6. MORTGAGES — FORECLOSURE — JUDICIAL PROCEEDINGS — REDEMPTION PERIOD.

The redemption period for mortgage foreclosures by judicial proceedings is six months (MCL 600.3240[6]; MSA 27A.3240[6]).

*James F. Bauhof,* for plaintiffs.

*Gemrich, Moser, Dombrowski, Bowser & Fette* (by *Robert R. Lohrmann*), for defendant.

Before: CYNAR, P.J., and SAWYER and J. S. THOR-BURN,* JJ.

SAWYER, J. Plaintiffs appeal from a judgment of foreclosure entered by the circuit court following a bench trial. We affirm.

In June of 1975, plaintiff Donald Holland became interested in purchasing a franchise from Captain Chips Potato Ship, Inc., and approached defendant's commercial loan office to arrange financing for the purchase and to cover the setup and operational costs. Defendant granted the $25,000 loan request.

Plaintiffs met with an officer of the bank for closing on the loan and executed a variety of documents, including a promissory note, a second mortgage on their home to secure the loan, and a sworn statement that they were an unincorporated individual business entity and that the proceeds of the loan would be used solely for business purposes. The loan was to be paid in monthly installments. However, approximately one year later the agreement was changed to a series of renewable promissory notes. Initially, the renewable note was for a ninety-day term. However, in September of 1977, it became a demand note requiring monthly payments of $200 plus interest and, in 1979, became a one-year note requiring monthly payments of $250 plus interest. The last such annual note was executed on July 6, 1981, due on July 6, 1982, and provided for interest at the rate of three percent plus the consensus New York prime rate, with the interest not to be less than eleven percent, and requiring a minimum monthly payment of $250 plus interest.[1]

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] At some point between September of 1975 and sometime in 1978, plaintiffs took out a second commercial loan which was subsequently consolidated in 1978 with the initial loan.

On March 1, 1980, plaintiffs sold the restaurant franchise on a conditional sales contract. Under the terms of the agreement, plaintiffs were to receive $2,000 and the new owners were to assume the outstanding obligation owed on the promissory note, which at that point had a principal of $20,160.08. However, defendant refused to release plaintiffs from their obligation under the renewable promissory note. ·Accordingly, plaintiffs remained liable on the note following the sale.

The new owners of the franchise made the monthly payments on the note until February 26, 1982, at which time the last payment on this note was made. After this payment, defendant alleges that $16,021.93 remained outstanding. In August of 1982, defendant informed plaintiffs that it was commencing foreclosure proceedings pursuant to the second mortgage executed in 1975.

A week prior to the scheduled September 28, 1982, foreclosure sale, plaintiffs filed suit in circuit court seeking declaratory and injunctive relief. The trial court issued a temporary restraining order and an order to show cause. By stipulation, the temporary restraining order became a preliminary injunction on October 8, 1982. On January 10, 1983, defendant filed a counterclaim for foreclosure of the mortgage against plaintiffs.

Subsequently, plaintiffs moved for summary judgment pursuant to GCR 1963, 117.2(2) and (3), alleging that defendant had failed to state a valid defense and that, except as to damages, there was no genuine issue of material fact. Specifically, plaintiffs alleged that defendant was without statutory authority to write a second mortgage. Plaintiffs also argued that the interest rate charged on the second mortgage was usurious and, therefore, could not be recovered by defendant. The trial court denied the motion, concluding that a trial

was necessary in order to achieve a full factual development necessary to a resolution of the matter.

Following a bench trial, the trial court ruled that there was a valid second mortgage and that the interest charged on the loan was not usurious as the loan was made to a business entity for commercial purposes. Consequently, the trial court set aside the injunction and allowed defendant to proceed with foreclosure proceedings. Plaintiffs thereafter filed a motion for additional findings of fact and amendments of the prior findings of fact and a rehearing, which the trial court granted. Following that rehearing, the trial court reaffirmed its conclusion that there was a valid second mortgage and that the interest rate was not usurious. In addition, the trial court found that plaintiffs had failed to prove that the checks they claimed were not credited to the loan had, in fact, not been credited. Finally, it determined that there remained $14,139.52 to be paid on the principal and that there was $5,340.45 due in interest.

Defendant prepared a proposed judgment, to which plaintiffs filed an objection claiming that, while they were entitled to a one-year redemption period, the judgment provided for only a six-month redemption period. Following a hearing, the trial court determined that the six-month redemption period was appropriate because foreclosure was by judicial proceeding and not by advertisement. Consequently, the trial court entered the judgment as proposed by defendant.

I

The first issue for our consideration is whether defendant had the authority to issue a second mortgage. We conclude that it did.

Plaintiffs argue that MCL 487.494; MSA 23.710(194), as it existed in 1975 when the instant mortgage was executed, prevented defendant from writing a second mortgage. In support of their position, plaintiffs refer us to *Borkus v Michigan National Bank,* 117 Mich App 662; 324 NW2d 123 (1982). In *Borkus,* this Court concluded that MCL 487.494; MSA 23.710(194), prior to 1978, prohibited banks from taking a second mortgage in real estate loans.[2] Defendant responds that the state statute, by its own terms, limits banks to first mortgages only for real estate loans and that the limitation to first mortgages does not apply to commercial loans. Thus, defendant argues that the statute, even prior to 1978, permitted banks to take second mortgages to secure commercial loans.

We begin by noting that the *Borkus* Court does not appear to have addressed the question whether the state statute actually prohibits the taking of second mortgages. Rather, the *Borkus* Court's interpretation of the statute appears to be based upon the assumption that the express reference to first mortgages, and the limitations thereon, implies the prohibition of second mortgages. While we do not necessarily agree with the *Borkus* panel's interpretation of the statute, we find it unnecessary to consider the question whether the statute, in its pre-1978 form, prohibited second mortgages or merely placed limitations on first mortgages and left the question of second mortgages unaddressed. For the reasons to be discussed below, we also find it unnecessary to consider the question posed to us by the parties: whether the commercial loan exception contained in the stat-

---

[2] As noted by the *Borkus* panel, that statute was amended in 1978 to delete any reference to "first mortgage." Thus, even if the statute prohibited second and subsequent mortgages prior to 1978, the 1978 amendment now allows for such mortgages.

ute should be construed as limiting banks to accepting first mortgages on commercial loans, but excepting those first mortgages from the limitations contained in the statute or, as suggested by defendant, that the commercial loan exception also exempts banks from the alleged limitation to only writing first mortgages.

We find it unnecessary to consider whether MCL 487.494; MSA 23.710(194), in its pre-1978 form, permitted the writing of a second mortgage under the fact situation of the case at bar for a very basic reason which appears to have been overlooked by all parties to this suit. Section 194 of the Banking Code, both in 1975 and now, concerned itself with what a "bank" may or may not do in the context of mortgages on real estate. Under § 5(c) of the code,[3] "bank" is defined as "a state banking corporation organized or reorganized under the provisions of this act . . . ." Defendant is a national banking association, not a state banking corporation.

It is true that national banks are authorized to make any loan which a state bank or lender is allowed to make under state law. *Borkus, supra* at 671. However, it does not follow that a national bank is subject to the same restrictions as a state bank. Rather, national banks may have rights which arise independent of state laws which are binding upon state banks, but not upon national banks. See *Northway Lanes v Hackley Union National Bank & Trust Co,* 464 F2d 855 (CA 6, 1972). Thus, the appropriate route to determining whether defendant had the authority to write a second mortgage in 1975 is not by way of an analysis of the state law at that time, but by an analysis of federal banking law as it existed in 1975.

___

[3] MCL 487.305(c); MSA 23.710(5)(c).

The appropriate federal statute to be considered is 12 USC 371(a). As noted by the *Borkus* Court, prior to amendment in 1974, that federal statute authorized a national banking association to make real estate loans secured by first liens on real estate. It also contained a commercial loan exception. However, as the *Borkus* Court noted, the statute was amended in 1974 to delete any references to first liens. Thus, even accepting, without deciding, the argument that the reference to "first liens" implies the prohibition of second liens, since the 1974 amendment national banking associations have no longer been restricted to first liens. Thus, in 1975, when the mortgage in the instant case was executed, national banking associations were authorized by federal law to accept second liens on real estate. Since defendant is a national banking association, we conclude that, at the time of the instant loan in 1975, it was authorized to accept a second mortgage on real estate regardless of whether the loan was for commercial purposes and regardless of whether state banks were not authorized to do so until 1978.[4] Therefore, as noted by the trial court, defendant, as a national bank, was permitted to accept a second mortgage. Accordingly, the trial court's finding that defendant was authorized to take the mortgage is affirmed.

II

Plaintiffs next argue that the trial court erred in determining that the loan at issue is not usurious because it is subject to the business entity exception to the usury statute.

Unless a loan comes within some other provision

---

[4] Again, we stress that we specifically do not address the question whether the state banking law prohibited the writing of second mortgages prior to 1978.

of the usury statute, the lawful rate of interest, where stipulated in writing, is seven percent per annum. MCL 438.31; MSA 19.15(1). Among the exceptions is the business entity exception contained in MCL 438.61; MSA 19.15(71). As the statute was worded in 1975, it provided that, notwithstanding the provisions of MCL 438.31-438.33; MSA 19.15(1)-19.15(3), but subject to the provisions of other state and federal statutes, any state or nationally chartered bank could extend credit to any business entity at any rate of interest agreed to in writing. The statute defined a "business entity" as (1) any corporation, trust, estate, partnership, cooperative or association, or (2) any natural person who furnishes to the extender of the credit a sworn statement in writing specifying the type of business and business purpose for which the proceeds of the loan will be used, except that that exception does not apply if the extender of credit has notice that the person signing the sworn statement will not be engaged in the business indicated.

A

Plaintiffs' first argument is that the trial court erred in determining that plaintiff Cherie Holland was a part of the business entity known as Captain Chips Potato Ship, despite the fact that both plaintiffs supplied defendant with a sworn statement of doing business as a business entity.

It is also undisputed that the proceeds of the loan were, in fact, actually used for the stated business purpose of providing the start-up capital for the restaurant. With this in mind, we find it unnecessary to consider whether the trial court's remaining factual conclusions on this issue were clearly erroneous as we believe that, even viewing

the facts in a light most advantageous to plaintiffs, a proper statutory construction indicates that the trial court reached the correct conclusion. Specifically, we accept plaintiffs' argument that plaintiff Cherie Holland's involvement in the business was limited to her participation in the loans by signing the promissory notes and the mortgage and that she had no further involvement such as working in the business or participating in the management of the restaurant. However, we believe that, even if plaintiff Cherie Holland's involvement was as limited as plaintiffs suggest, her limited involvement was sufficient to make the business entity exception to the usury statutes applicable to the case at bar.

In interpreting whether an exception to the usury statutes is applicable, we look not to the form of the transaction, but to the real nature of the loan. *Paul v U S Mutual Financial Corp,* 150 Mich App 773, 783; 389 NW2d 487 (1986). See also *Allan v M & S Mortgage Co,* 138 Mich App 28; 359 NW2d 238 (1984); *Blessing v Zeffero,* 149 Mich App 558; 386 NW2d 590 (1986). In looking at the loan in the case at bar, all of the evidence available indicates that the total proceeds of the loan were used to further plaintiff Donald Holland's desire to open and operate his own Captain Chips Potato Ship. We are not faced with a situation, such as in *Allan, supra,* where a business form was used to conceal a fraudulent loan for the purposes of evading the usury statute. Rather, we have a loan in which the proceeds were used to further a business purpose, although one of the two individuals liable on the loan may not have been actively engaged in the operation and management of the business. Thus, plaintiffs in effect require us to determine whether the noninvolvement of one or more parties to the loan in the operation and

management of the business is sufficient to defeat the business entity exception. We conclude that it is not.

In order to agree with plaintiffs, it would be necessary for us to conclude that plaintiff Cherie Holland was not "engaged in business" and, thus, not part of the business entity to which the loan was made and, therefore, the loan as a whole fails to be a loan to a business entity within the meaning of the statute. The statute in question does not provide us with a definition of "engaged in business," thus necessitating our interpretation of the phrase.

The overall policy of the business entity exception statute is to allow business entities to contract for loans without the entangling restrictions of the usury statute, which may make it difficult for the business to obtain credit. We believe that the purpose of the exception to the exception, that is where the lender is aware that the person signing the sworn statement was not engaged in the business indicated, is designed to prevent the fraudulent use of the business entity exception where the parties are aware that there is no business or business purpose involved in the loan.[5] We conclude that the exception does not apply where, as here, all parties to the loan know that the proceeds of the loan would be applied to a business purpose.

[5] See *Allan, supra,* which considered the use of the corporate form as a sham to avoid usury ceilings on second mortgages by use of MCL 450.1275; MSA 21.200(275), which provides that a corporation may agree to pay a rate of interest in excess of the legal rate and not raise the defense of usury. Although this statute is separate and distinct from the business entity exception at issue in the case at bar, we believe that the policies behind both exceptions are similar and that the *Allan* Court's rejection of the use of a sham corporation to avail itself of the corporation exception relies upon the same policy considerations as does the provision of the business entity exception which prohibits the use of that exception where the lender is aware that the person is not engaged in the business indicated.

However, the mere conclusion that the loan at bar does not violate the spirit of the business entity exception statute does not resolve the question of to what extent a party to a loan must be involved in the business in order for the business entity exception to continue to apply. The most appropriate interpretation to give to the statute to effectuate the policy behind the statute, both in terms of making credit more easily available to businesses and preventing the exception from being abused, is that a person is engaged in a business even where their only participation is in becoming liable on the loans for the business and pledging a personal property interest as collateral for the loans. This interpretation is not unduly broad. Indeed, it recognizes that a person's most valuable contribution to a new business may very well be his financial investment or credit worthiness. To accept plaintiffs' interpretation of the statute would require the conclusion that the business entity exception would be inapplicable whenever a group of individuals apply for a business loan and one or more of those individuals' participation in the business is limited to becoming liable on the note and the pledging of personal assets as collateral for the loan. That individual could very well be a key to the successful opening and operation of the business, even where he has no further participation, inasmuch as his liability on the note may be essential to obtaining the necessary financing for the operation of the business. This is true whether we speak of a wife pledging her share of marital assets for the husband's business venture, the proverbial rich uncle who assists a nephew or a niece in starting a business by arranging for the start-up financing, or the venture capitalist who uses his creditworthiness in an arms-length invest-

ment transaction as his role in the start-up of a new business.

Thus, we believe that the appropriate focus of an inquiry into whether the business entity exception applies is not with the roles of the parties to the loan, but with the loan as a whole. We must determine whether it was made for a business purpose and whether the parties were aware of this fact. Thus, the business entity exception presumably would not apply where, despite the execution of the sworn statement called for in the statute, the loan's real purpose was not for business but for some personal project and the lender is aware of this fact. This, we believe, is the abuse of the business entity exception which the statute addresses.[6]

Thus, we conclude that where, as here, the purpose of the loan is consistent with the business-purpose requirement of the business entity exception and where all of the borrowers are aware that it is a business loan with the proceeds to be applied for a business purpose, the business entity exception applies regardless of whether any single borrower is involved in the business entity beyond his participation in the loan.

B

Plaintiffs also argue that the business entity exception is inapplicable because a valid sworn statement was not provided for defendant as required by the statute. While it is not disputed that

---

[6] There may also be some question as to the applicability of the business entity exception where one of the parties to the loan was deceived as to the purpose of the loan and the lender is aware of the deception. For example, plaintiffs in the case at bar may have had a meritorious argument had plaintiff Cherie Holland believed that the loan was for personal purposes and had defendant been aware of her misconception as to the purpose of the loan.

plaintiffs signed the sworn statement, plaintiffs argue that the statement was not properly executed as the notary public who witnessed and notarized their signatures did not require them to raise their right hands and swear an oath before they signed the statement. Thus, plaintiffs argue that the statement was never properly sworn.

The business entity exception statute is applicable, among other situations, where the borrowers provide a sworn statement acknowledging the business purpose of the loan for use by a business entity. It was under this provision that the loan was made in the case at bar. MCL 600.1432; MSA 27A.1432 provides as follows:

> The usual mode of administrating oaths now practiced in this state, by the person who swears holding up the right hand, shall be observed in all cases in which an oath may be administered by law except in the cases herein otherwise provided. The oath should commence, "You do solemnly swear or affirm."

It is undisputed that this statute was not fully complied with as plaintiffs did not raise their right hands and swear an oath before the notary. However, we do not believe that this invalidates the statement provided.

Plaintiffs rely on this Court's decision in *Dawson v Secretary of State,* 44 Mich App 390; 205 NW2d 299 (1973). In *Dawson,* the Secretary of State suspended the plaintiff's driver's license due to the plaintiff's refusal to take a breath test after being stopped by a Detroit police officer. The Secretary of State took the action based upon a report filed by the officer. However, it was determined that the officer had failed to raise his right hand and "solemnly swear" the report. The statute authorizing the suspension for failure to submit to a chem-

ical test specifically required that the officer file a sworn report. This Court concluded that the statute had not been complied with and that the officer's failure to follow the proper protocol in swearing the report rendered it invalid under the statute as a basis for suspending the plaintiff's driver's license.

However, we also find guidance in the Supreme Court's decision in *Mettetal v Hall,* 288 Mich 200; 284 NW 698 (1939). In *Mettetal,* the trial court apparently went to the home of an elderly witness as health considerations prevented her from traveling to the courthouse and the witness made a statement in front of the trial judge, court stenographer, and counsel. Inadvertently, the witness was not sworn before giving her statement. On appeal, the defendants complained of the fact that the witness had not been properly sworn. The Supreme Court noted that, while the defendants did have a right to insist upon the witness being sworn, they failed to insist upon it at the time the witness gave her statement. Accordingly, the Court deemed that the defendants had waived the administration of an oath. Accordingly, the Court would not permit the defendants to repudiate in the Supreme Court what they had acquiesced to in the trial court. *Id.* at 208.

In the case at bar, we begin by noting that plaintiffs do not on appeal, nor did they in the trial court, challenge the fact that it is their signatures that appear upon the statement; neither do they challenge the veracity of the statement.[7] We believe that the case at bar is closer to the situation in *Mettetal* than it is to *Dawson.* In

[7] As discussed above, plaintiffs do challenge the fact of whether Cherie Holland was a part of the business entity despite her signature on the statement to that effect. However, as we concluded above, she was a part of the business entity to the extent that she participated in the financing scheme.

*Dawson,* this Court was considering a case which was quasi-criminal in nature, where the statement which was to be sworn was not being challenged by the declarant of the statement, but by, in essence, an opponent of the declarant. Moreover, there is nothing in *Dawson* to suggest that the plaintiff had an opportunity to challenge the police officer at the time the officer made the statement as to whether or not he was properly swearing the statement. In the case at bar, however, plaintiffs were obviously present at the making of the statement and acquiesced to the procedures used in the making of the statement, much like the defendant in *Mettetal.*

This is an action in equity and we do not believe that the principles of equity would permit plaintiffs to take advantage of their own failures in properly executing a document in order to avoid the contractual consequences of signing the document. Accordingly, we do not believe that the trial court erred in concluding that the statement was enforceable despite the fact that the formalities of giving a sworn statement may not have been fully complied with.

III

Plaintiffs next argue that the trial court erred in determining the amount due on the notes to be $14,139.52 in principal and $5,340.45 in interest. We disagree. We begin by noting that we review the findings of fact of a trial court to determine if the findings are clearly erroneous. MCR 2.613(C).[8] A finding of fact is clearly erroneous when, although there is evidence to support it, the review-

---

[8] In their brief on appeal, plaintiffs inaccurately state that the standard of review is whether the trial court abused its discretion. However, as the above court rule clearly indicates, factual findings are reviewed under the clearly erroneous standard.

ing court is left with a definite and firm conviction that a mistake has been committed. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

We have carefully reviewed the lower court record and we are not left with the definite and firm conviction that a mistake has been committed. While it appears that the records maintained by defendant leave something to be desired, plaintiffs have not persuaded us that the trial court's conclusion is erroneous.

IV

The final question for our consideration is whether the trial court erred in concluding that a six-month redemption period applied to the case at bar rather than a twelve-month redemption period. We find no error. MCL 600.3201; MSA 27A.3201 provides for foreclosure by advertisement. When there is a foreclosure by advertisement, the property may be redeemed within one year from the date of sale. MCL 600.3240(6); MSA 27A.3240(6). However, where a foreclosure is by judicial proceeding under MCL 600.3140; MSA 27A.3140, the redemption period is six months. In the case at bar, defendant initially began foreclosure by advertisement. However, following the issuance of the temporary injunction, defendant filed a counterclaim for foreclosure. Thus, the case turned into foreclosure by judicial proceeding. Accordingly, the trial court properly applied the six-month redemption period.

Affirmed. Costs to defendant.