**In re Charles D. CORRADINI, Debtor.**

**Gary Corradini, Plaintiff,**

v.

**Charles Corradini, Defendant.**

**Bankruptcy No. GG 01–02443
Adversary No. 01–88233.**

United States Bankruptcy Court,
W.D. Michigan.

April 19, 2002.

---

—

William J. Stevens, Esq., Portage, Michigan, for Plaintiff Gary Corradini.

William J. Napieralski, Esq., Grand Rapids, Michigan, for Defendant–Debtor Charles Corradini.

## OPINION REGARDING DISCHARGEABILITY OF DEBT

JAMES D. GREGG, Chief Judge.

### I. ISSUES

Has the Debtor's obligation under the promissory note given to the Plaintiff been satisfied by payment? If a debt under the promissory note remains, is it nondischargeable because the loan was procured as a result of the Debtor's fraud or false representations?

### II. JURISDICTION

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.). This adversary proceeding is a core proceeding because it involves a determination of the dischargeability of a debt. 28 U.S.C. § 157(b)(2)(I). The following constitutes the court's find-

ings of fact and conclusions of law. FED R. BANKR. P. 7052.

### III. FACTS AND PROCEDURAL BACKGROUND

Gary Corradini, "Plaintiff", filed this adversary proceeding seeking to establish that a debt owed to him by the defendant, Charles Corradini, "Debtor", is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.[1]

The debt at issue in this case arose after the Plaintiff sought financial advice from the Debtor, who is a Certified Public Accountant and a cousin of the Plaintiff. Transcript of Corradini Nondischargeability Hearing at 24 (hereinafter "Tr. at ___") and Exhibit ("Exh.") 1. As requested by the Plaintiff, the Debtor made several investment proposals. Each proposal involved the development of real property located on Lake Montcalm Road in Pierson Township, Michigan ("the Pierson property"). Exhs. 3–5. One proposal from the Debtor required an investment of $65,000 from the Plaintiff. In that proposal, construction costs and a $15,000 "land cost" were deducted from potential profits. Exh. 3. The Plaintiff rejected the proposal, but continued to discuss various investment options with the Debtor. Tr. at 27–31.

When these proposals were made, the Debtor was residing on the Pierson property. Tr. at 87. The property was owned, however, by Keith and Terri Grannis ("Grannis"). Exh. 31. The Debtor leased the Pierson property and had an option to purchase the property from Grannis for one dollar. Exh. 17.

The discussions between the Plaintiff and the Debtor resulted in two separate loan transactions. On April 23, 1995, the Plaintiff loaned the Debtor $30,000 (the "first loan"). In accordance with the Debtor's request, the Plaintiff made and delivered four undated checks, in the amount of $7,500 each. Tr. at 31–32 and Exh. 8. All four checks were made payable to Grannis. Exh. 8. In exchange, the Debtor executed a promissory note. The note provided for repayment of the Debtor's loan before July 1, 1995, and stated, in pertinent part, that "[t]his note is secured by [the Pierson property] . . . ." Exh. 6. No mortgage was executed or recorded. Tr. at 62. The rate of interest under the note was fifteen percent. Exh. 6.

The Plaintiff alleges that the promissory note language caused him to believe that the Debtor owned the Pierson property. Tr. at 59–60. The Plaintiff contends that this perception was reinforced by several oral representations made by the Debtor. Tr. at 59–60. Consequently, the Plaintiff assumed that the promissory note granted him a valid security interest in the Pierson property. Tr. at 33. The Plaintiff stated that he would not have loaned $30,000 to the Debtor if he had known that the Debtor did not own the Pierson property. Tr. at 53.

In June, 1995, the Plaintiff loaned the Debtor an additional $25,000 (the "second loan") by issuing four checks drawn on his credit union account.[2] Tr. at 38; Exh. 9. The checks were payable to "Grannis, Inc." Tr. at 38. No promissory note, nor any other documentation, was executed in connection with this second loan. Tr. at 63, 98–99. A year or more after the second loan was made, the Plaintiff obtained

---

1. The Bankruptcy Code is contained in 11 U.S.C. §§ 101–1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ___."

2. Three checks were in the amount of $7,500 and one check was in the amount of $2,500. Exh. 9.

title documents. He learned that the Debtor was not the owner of the Pierson property. Tr. at 42; Exh. 31.

In March, 1997, the Debtor paid the Plaintiff $33,000. Tr. at 45–46; Exhs. 10 & 11. The source of the payment was an inheritance that the Plaintiff received from his father's death. Tr. at 99. When the Debtor made the $33,000 payment no instructions were given to the Plaintiff regarding application to a particular debt, i.e. the first loan evidenced by the promissory note or the second loan. Tr. at 48. When the Plaintiff received the $33,000 payment, he did not apply it to any particular debt; he "just accepted it." Tr. at 48.

On March 9, 2001, approximately four years after making the $33,000 payment to the Plaintiff, the Debtor filed a voluntary petition for relief under chapter 7. The Plaintiff commenced this adversary proceeding on June 1, 2001. The Plaintiff's complaint alleges that the $30,000 first loan was procured through the Debtor's false representations regarding his ownership of the Pierson property.[3] The Plaintiff contends that the remaining indebtedness should be excepted from the Debtor's discharge under § 523(a)(2)(A). Although the Plaintiff's complaint requests $22,000 in damages, it makes no reference to the circumstances surrounding the second loan.[4] Accordingly, the inquiry in this case

pertains to the dischargeability of the $30,000 first loan evidenced by the promissory note. Exh. 6.

## IV. DISCUSSION

### A. Existence of "Debt."

Section 523(a)(2)(A) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any **debt**—

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ....

§ 523(a)(2)(A) (emphasis added). Under the Bankruptcy Code, "debt" is defined as "liability on a claim." § 101(12). As a result of the definitional statutory provisions, an analysis regarding nondischargeability of a particular debt would be premature unless the court first determines that some "liability" remains on the Plaintiff's claim. In this adversary proceeding, the critical inquiry is whether any liability on the $30,000 first loan remains outstanding.

■ The Bankruptcy Code does not direct how payments are to be applied against a debt. See Remes v. ACME Car-

---

3. The complaint asserted causes of action under both § 523(a)(2) and § 523(a)(6). During the Plaintiff's opening statement at the trial, upon questioning by the court, the Plaintiff withdrew his allegations of "willful and malicious injury" under § 523(a)(6). Tr. at 22. At conclusion of Plaintiff's proofs, the court dismissed the cause of action under 11 U.S.C. § 523(a)(6). Tr. at 106–07.

4. On January 11, 2002, approximately three weeks before this matter was scheduled for trial, the Plaintiff filed his Motion for Leave to File First Amended Complaint Regarding Non–Dischargeability of Debt and his First Amended Complaint Regarding Non–Dis-

chargeability of Debt. The proposed First Amended Complaint raised several new issues, including the existence of the second loan. The Debtor objected to the Plaintiff's motion to amend. A hearing regarding that motion was held immediately before the trial commenced on February 4, 2002. In accordance with the Pretrial Order which set forth explicit requirements for amendment of pleadings, the Rule 7009(b) requirement regarding pleading of fraud with particularity, and the prejudice the proposed amendment would impose upon the Debtor, this court denied the Plaintiff's Motion to Amend.

ton Corp. (In the Matter of Fasano/Harriss Pie Co.), 43 B.R. 871, 879 (Bankr. W.D.Mich.1984). Therefore, to determine whether any debt from the first loan remains after the Debtor's $33,000 payment to the Plaintiff, the court must examine Michigan law regarding application of payments. Id.

██ Under Michigan law, a debtor may direct application of a payment before or at the time it is made. See People ex rel. Michigan Electric Supply Co. v. Vandenburg Electric Co., 343 Mich. 87, 90, 72 N.W.2d 216, 218 (1955). See also Fasano/Harriss, 43 B.R. at 879. If, however, the debtor fails to so direct, "the creditor may apply [the payment] as he pleases either at the time the of payment or afterwards, if before controversy arises concerning it." People ex rel. Michigan Electric Supply Co., 343 Mich. at 90, 72 N.W.2d at 218. The creditor has wide discretion and may decide, for instance, to apply the payment to satisfy the oldest debt or the debt that is unsecured rather than secured. People ex rel. Michigan Electric Supply Co. v. Vandenburg Electric Co., 343 Mich. at 92–93, 72 N.W.2d at 219 (creditor is not required to apply payments first to secured and then to unsecured claims); Grand Rapids Realty Co. v. Rogers, 317 Mich. 454, 457, 26 N.W.2d 926, 927 (1947) ("creditor may apply payments . . . to that portion of debtor's obligation which was first incurred"). The creditor bears the burden of showing, "by a preponderance of the evidence what application, if any, he made of the amount received." People ex rel. Michigan Electric Supply Co., 343 Mich. at 91, 72 N.W.2d at 218. "[I]n the absence of such action by either debtor or creditor, . . . [if] there is no evidence of any understanding to the contrary, the credit will be considered as

applied to debits in the order of time in which the debits occurred." Id.

In this adversary proceeding, the Debtor failed to direct application of the $33,000 payment. Tr. at 48. The transmittal accompanying Debtor's $33,000 check merely requested that the Plaintiff consult his check register for the dates and amounts of the money loaned to the Debtor. Exh. 10.

██ In the absence of specific direction from the Debtor, the Plaintiff was entitled to choose how the payment would be applied. However, the plaintiff must provide evidence to prove that he applied the payment to a certain portion of the debt before any controversy arose concerning that payment. See e.g. People ex rel. Michigan Electric Supply Co., 343 Mich. at 91, 72 N.W.2d at 218 (testimony by Plaintiff's president and handwritten "key letters" in Plaintiff's ledger was sufficient evidence to support Plaintiff's claim that it applied payments to specific debts). The Plaintiff in this case offered no evidence to demonstrate whether he applied the $33,000 payment to the first loan or the second loan. When questioned at trial about what he had done with the payment, the Plaintiff testified that he had "just accepted it." Tr. at 48.

Since neither party in this case directed application of the $33,000 payment, the state law presumption governs—the oldest debts are paid first. See Fasano/Harriss, 43 B.R. at 879. Therefore, the $33,000 payment must be applied to the older first loan which was evidenced by the promissory note.

██ Immediately after application of the $33,000 payment, the remaining balance owed on the note was $5,506.93.[5] The Debtor argues that the fifteen percent

5. The promissory note was executed on April 23, 1995. Exh. 6. One year and 325 days

later, on March 14, 1997, the $33,000 payment was deposited in the Plaintiff's bank

interest rate required by the note is usurious and unenforceable. *See generally* Carl W. Herstein, *Michigan Usury Law*, 27 Wayne L.Rev. 435, 509 (1981) (discussing Michigan usury law in detail and characterizing Michigan's usury law as "a morass").

Michigan usury law provides that "it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, *not exceeding 7% per annum.*" Mich. Comp. Laws Ann. § 438.31 (West 1995) (emphasis added). Absent an exception to this general rule, the fifteen percent interest rate charged in the promissory note is unenforceable. Mich. Comp. Laws Ann. § 438.32 (West 1995).

The Plaintiff asserts that the business entity exception to the usury statute applies to this transaction. Mich. Comp. Laws Ann. § 438.61 (West 1995 & Supp.2001). The statute provides that:

> Notwithstanding Act No. 326 of the Public Acts of 1966, it is lawful in connection with an extension of credit to a business entity by any person other than a state or nationally chartered bank, insurance carrier, or finance subsidiary of a manufacturing corporation for the parties to agree in writing to any rate of interest not exceeding 15% per year.

Mich. Comp. Laws Ann. § 438.61(3) (West 1995 & Supp.2001). The statute defines a "business entity" as, *inter alia,* "a natural person who furnishes to the extender of the credit a sworn statement in writing specifying the type of business and business purpose for which the proceeds of the loan or other extension of credit will be used." Mich. Comp. Laws Ann. § 438.61(1)(a) (West 1995 & Supp.2001).

The statute which provides for the business entity exception has not been satisfied in the present adversary proceeding. The Debtor failed to provide the Plaintiff with a written, sworn statement specifying the business purpose for which the loan proceeds were to be used. Nor was there any other evidence or documentation from which a valid business purpose could be inferred. *Cf. Krause v. Griffis*, 178 Mich. App. 111, 443 N.W.2d 444 (Mich.Ct.App. 1989) (finding the business entity exception applicable where a signed, notarized land contract referred to an adult foster care facility as "income potential property" and there was "no question that the parties involved knew that the property was being used for business purposes"); *Holland v. Michigan Nat'l Bank–West*, 166 Mich.App. 245, 420 N.W.2d 173 (Mich.Ct.App.1988) (holding that the business entity exception applied to a loan for the purchase of a restaurant franchise, notwithstanding the fact that the statement of business purpose was not properly notarized). Because the business entity exception is inapplicable, no interest may be charged under the note. Thus, the first loan indebtedness was fully satisfied by the $33,000 payment.[6]

**B.** *Justifiable Reliance and Intent to Deceive*

■■■■ Even assuming that a "debt" remains owing on the first loan, the Plain-

---

account. Exh. 11. Under the terms of the note, interest was accruing during this time period at a rate of $4,500 per annum or approximately $12.329 per day. Thus, $8,506.93 in interest had accrued under the note by the time the $33,000 payment was made. Adding this amount to the $30,000 principal made a total of $38,506.93 due under the note as of March 14, 1997. Subtracting the $33,000 payment from this amount left an outstanding balance of $5,506.93 as of the payment date. Assuming interest may be collected, interest continued to accrue from the March 14, 1997, payment date until the Debtor filed his chapter 7 bankruptcy case. § 502(b).

**6.** Under Michigan law, the remaining $3,000 payment was applied to partially satisfy the second loan.

tiff has failed to demonstrate that such remaining debt should be excepted from discharge. To prevail in a nondischargeability action under § 523(a)(2)(A), the creditor must prove that:

1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; 2) the debtor intended to deceive the creditor; 3) the creditor justifiably relied on the false representation; and 4) its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir.1998), *cert. denied,* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). *See also Longo v. McLaren (In re McLaren),* 3 F.3d 958, 961 (6th Cir.1993). The burden of proof is upon the creditor to establish each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). *See also Atassi v. McLaren (In re McLaren),* 990 F.2d 850, 852 (6th Cir.1993). Further, it is well-settled that "exceptions to discharge are to be strictly construed against the creditor." *In re Rembert,* 141 F.3d at 281; *Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988).

■ With regard to the reliance element, the United States Supreme Court has held that a plaintiff need only demonstrate "justifiable" rather than "reasonable" reliance on the defendant's false representations in order to have the resulting debt declared nondischargeable. *See Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). Justifiable reliance requires proof that a plaintiff actually relied upon the defendant's false representations and that such reliance was justified under the circumstances. *See Field v. Mans,* 516 U.S. at 70, 116 S.Ct. at 444 (citing *Restatement*

*(Second) of Torts* § 537 (1976)); *Lentz v. Spadoni (In re Spadoni),* 271 B.R. 703, 710 (1st Cir. BAP 2002). Thus, "before embarking on an analysis of whether the [Plaintiff] acted justifiably, the Court must first be sure that the [Plaintiffs] proved they actually relied on representations of the Debtor." *AT & T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724, 730–31 (Bankr.N.D.Ill.1996) (applying § 523(a)(2)(A) factors in a case of alleged credit card fraud). *Accord Kinsler v. Pauley (In the Matter of Pauley),* 205 B.R. 501, 507 ("the general principles regarding the need to prove actual reliance are equally applicable to all claims brought pursuant to section 523(a)(2)(A)").

■ In this adversary proceeding, the Plaintiff asserts that he would not have made the loan had he known that the Debtor did not own the Pierson property. The circumstances surrounding the transaction, however, contradict this assertion. Only approximately two months after making the first loan, the Plaintiff loaned the Debtor an additional $25,000—this time with no promissory note, no additional security, and no documentation. Tr. at 38; Exh. 9. The second loan was made notwithstanding that no portion of the first loan had been repaid. Therefore, the court finds the security interest that the promissory note attempted to convey was not a material factor in inducing the Plaintiff to make the first loan. Because the Plaintiff agreed to make the second loan, for nearly the same amount of money, with no similar provision, the court disbelieves the Plaintiff when he asserts that he relied upon representations regarding ownership of the Pierson property. The court finds that the Plaintiff did not actually rely on the Debtor's false representations regarding his ownership of the Pierson property.[7]

Also, the court does not believe the Debtor intended to deceive the Plaintiff.

7. The circumstances surrounding the second     loan transaction between the Plaintiff and the

1

79

The checks were made payable to Grannis. The court accepts the Debtor's explanation that he disclosed the material circumstances to the Plaintiff. More importantly, as soon as the Debtor was able to pay, when he received an inheritance from his father's death, he paid a substantial sum of money to his Plaintiff-cousin.

## V. CONCLUSION

After the promissory note was satisfied by the $33,000 payment, no "debt" remained which could be excepted from discharge. Even if a debt remained, the Plaintiff failed to prove actual reliance upon the Debtor's representations and that the Debtor intended to deceive him in the first loan transaction. The complaint shall be dismissed for no cause of action. A separate order shall be entered accordingly.

Debtor were not timely pled in the original complaint and are not before the court. Even if the second loan was considered, the debt would be dischargeable. No promissory note was executed in conjunction with the second loan, and the Plaintiff has no evidence to demonstrate that he relied on the Debtor's representations regarding ownership of the Pierson property.